IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-CRIMINAL-14026-CANNON


UNITED STATES OF AMERICA,

             Plaintiff,               NOVEMBER 17, 2022

     vs.

                                         FORT PIERCE, FLORIDA

DANIEL ZAMOT,

             Defendant.          Pages 1 - 70

_____


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE AILEEN CANNON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     MICHAEL PORTER, AUSA
                       Office of U.S. Attorney
                       101 South US Highway One
                       Suite 3100
                       Fort Pierce, Florida  34950


FOR THE DEFENDANT:     KRISTI MILITELLO, AFPD
                       Office of U.S. Public Defender
                       109 North 2nd Street
                       Fort Pierce, Florida  34950


REPORTED BY:           DIANE MILLER, RMR, CRR
                       Official Court Reporter
                       (772)467-2337
                       diane_miller@flsd.uscourts.gov

<u>P-R-O-C-E-E-D-I-N-G-S</u>

1                                       

2         THE COURTROOM DEPUTY:  Calling case

3  22-Criminal-14026-Cannon, the United States v. Daniel Zamot.

4         Counsel, can you please state your appearance

5  starting with the Government?

6         MR. PORTER:  Good afternoon, Your Honor; Michael

7  Porter on behalf of the United States.

8         THE COURT:  Good afternoon.

9         MS. MILITELLO:  Good afternoon, Your Honor; Kristi

10  Militello on behalf of Daniel Zamot, who is seated next to me.

11         THE COURT:  Good afternoon, good afternoon,

12  Mr. Zamot.

13         Who is here for probation?

14         PROBATION OFFICER:  Good afternoon, Your Honor,

15  Nathan Vreeland, U.S. Probation.

16         THE COURT:  Good afternoon, Mr. Vreeland.

17         All right.  We are here for your sentencing hearing,

18  Mr. Zamot.  As you know, the record reflects that you pled

19  guilty to Counts I and II of the indictment, in exchange for

20  the government's agreement to dismiss Count -- I guess, is

21  there a Count III, in this case?

22         MR. PORTER:  There is not.

23         THE COURT:  There is not, never mind then, okay.

24         You have been adjudicated guilty, sir, of those two

25  offenses.  Count I charges you with carjacking in violation of

1   Title 18, United States Code, Section 2119, and Count II of the

2   indictment charges you with brandishing a firearm during and in

3   relation to a crime of violence, in violation of Title 18,

4   United States Code, Section 924(c)(1)(A)(2), and Title 18,

5   United States Code, Section 2.

6          I have reviewed the full record in anticipation of

7   today's hearing, including the sealed medical evaluation

8   prepared on your behalf and submitted by your attorney.

9          I have also reviewed the additional filings, in this

10  case, with respect to a request for a downward variance as well

11  as the government's request for a substantial assistance

12  motion.

13         If I have this all correct, Mr. Porter, are there any

14  other materials the Court should have received in anticipation

15  of today's hearing?

16         MR. PORTER:  Judge, the United States is prepared

17  today to amend its 5K motion to increase the recommendation.

18  Whenever we get to that point in sentencing, I wanted the Court

19  to know that I do intend to amend the 5K motion and I intend to

20  ask for -- to recommend a greater reduction, than what is

21  contained in the motion.

22         THE COURT:  All right.

23         Would your recommendation require invocation of

24  3553(e)?

25         MR. PORTER:  It will, Your Honor.

```
 1              THE COURT:  All right, you may be seated now, thank

 2   you.

 3              Ms. Militello, are there any other materials I should

 4   have received or reviewed for today's hearing?

 5              MS. MILITELLO:  No, Your Honor.

 6              THE COURT:  Okay.  Well, then let's get started and

 7   turn first to the PSI.  Are there any unresolved objections to

 8   the PSI, Ms. Militello?

 9              MS. MILITELLO:  There are not any unresolved

10   objections.  Probation and I spoke, and due to conflicts in

11   their schedule and the hurricane, they were unable to include

12   all of Mr. Zamot's mental health summary of his records.  We

13   did provide them the social security records and educational

14   records, and also the diagnoses from Dr. Sheila Rapa who I

15   intend to call for the Court.  So I would just ask if the Court

16   would instruct them to do a post-sentencing addendum, I think

17   it is important for that information to be in the PSI, so that

18   BOP has it when they place Mr. Zamot, also, so hopefully he can

19   get treatment.  And then I think, most importantly, when he is

20   on supervised release, if probation is not aware that he has a

21   diagnosis of an intellectual disability and PTSD, then he won't

22   receive services for those things.

23              So I would just ask the Court to instruct probation,

24   you don't have an objection, they just need the court order to

25   include those things after the hearing.
```

Thursday, November 17, 2022.

1          THE COURT:  So probation is so directed to prepare

2     any post sentencing PSI that incorporates the additional mental

3     health records referenced by Ms. Militello.

4          Any concerns with that, Mr. Vreeland?

5          PROBATION OFFICER:  No, Your Honor, I do have one

6     question, defense provided several records which may include

7     additions, supplements to his educational record, to his

8     employment record.  Would the Court mind if we were open to all

9     of the sections in Part C to update?

10          THE COURT:  I am perfectly happy with that broadening

11     of the project, so yes, please include all relevant information

12     in those multiple categories.

13          Thank you, Mr. Vreeland.

14          So is there anything else to discuss, Ms. Militello,

15     with respect to the PSI which will be supplemented as we

16     discussed?

17          MS. MILITELLO:  No, Your Honor.

18          THE COURT:  Any objections to the guideline

19     calculations, Ms. Militello?

20          MS. MILITELLO:  None.

21          THE COURT:  Mr. Porter, anything to add?

22          MR. PORTER:  No, Your Honor.

23          THE COURT:  All right.  Well, then let me state for

24     the record, the applicable guideline calculations, total

25     offense level 19, criminal history category one, which produces

```
 1   an advisory guideline range on Count I of 30 to 37 months,
 2   followed by the mandatory consecutive sentence of 84 months
 3   imprisonment on Count II, a supervised release recommended
 4   range of two to five years, a fine range of 20,000 to $200,000,
 5   although no fine is recommended, the restitution amount of
 6   $3,500, joint and several with defendant Artavis Spivey, and
 7   finally, the special assessment of $200.
 8           Is that correct, Ms. Militello?
 9           MS. MILITELLO:  Yes, Your Honor.
10           THE COURT:  All right.  Mr. Porter, anything to add?
11           MR. PORTER:  No, Your Honor.
12           THE COURT:  Well, having calculated the applicable
13   guideline range, I'll go ahead and adopt the PSI in full, of
14   course, anticipating that more fulsome PSI with the additional
15   information, but none of that much affects the calculations
16   themselves.
17           So let's turn now to hear from the government on
18   their proposal, Mr. Porter.
19           MR. PORTER:  Yes, Your Honor.  Judge, the United
20   States is amending the 5K motion, that was previously filed, in
21   this case.  First, the United States now is invoking 18, United
22   States Code, Section 3553(e).  The reason that is important is
23   because Count II carries a mandatory minimum sentence of seven
24   years.
25           I don't think Ms. Militello and I have any
```

Thursday, November 17, 2022.

1   disagreement as to the procedure I'm going to recommend.  I do

2   think Ms. Militello will ask for a greater percentage than what

3   the United States is asking for.  But the way the United States

4   is proceeding is, we are recommending that with respect to

5   Count II of the indictment, which is the 924(c) count, that

6   carries an 84-month mandatory minimum, the United States

7   believes that the defendant, Daniel Zamot, has, in fact,

8   provided sufficient substantial assistance in this case through

9   his cooperation with the United States, and based on that

10  substantial assistance, we are asking Your Honor to depart

11  downward from the 84-month sentence, mandatory minimum sentence

12  on Count II, to 50 months.  That equates to a departure of 34

13  months.

14          With respect to Count II of the indictment, we are

15  making our motion solely with respect to Count II of the

16  indictment, what that amounts to in a percentage-wise, if you

17  were to apply it to Mr. Zamot's total effective guideline

18  range, the bottom of his total effective guideline range is 114

19  months, 30 percent of that is 34 months.

20          But what I'm asking the Court to do is, pursuant to

21  3553(e), and Section 5K, depart solely from Count II in this

22  case, by 34 months to reflect the substantial assistance that

23  Daniel Zamot provided to the United States, as far as the

24  nature of his substantial assistance.

25          The Court, in the previous sentencing, heard

1    testimony from Mr. Zamot so I think Your Honor was able to get

2    a lot of the background regarding his cooperation and his role

3    in the offense.  Essentially, Mr. Zamot met with me right after

4    his initial appearance, right after he was brought over, and he

5    agreed to cooperate with the United States from the very

6    beginning of the case.  He agreed to testify against his

7    codefendant, Daniel Spivey.  I think it was impactful in this

8    case.  I believe that my proof was strong, there is video

9    evidence, there is fingerprint evidence, there is DNA evidence,

10   however, there were two people involved in this carjacking, so

11   I think it always would have been beneficial if the case had

12   gone to trial for the jury to be able to hear from one of the

13   participants in the crime.  So I think that his willingness to

14   cooperate was impactful and substantial to the United States.

15        As Your Honor heard, in the last sentencing hearing,

16   I did advise counsel for the codefendant, in this case, Artavis

17   Spivey, that Mr. Zamot was cooperating with the United States

18   and would, in fact, testify against Artavis Spivey if the case

19   proceeded to trial.

20        Shortly after that, Artavis Spivey ultimately pled

21   guilty.  But, before he pled guilty, he threatened Daniel Zamot

22   and his family and he coerced Daniel Zamot into writing a false

23   letter exonerating Artavis Spivey.  I think that that is one of

24   the factors for the Court to consider when evaluating the

25   extent of the cooperation.  In this case, Daniel Zamot and his

1    family were threatened as a direct result of his cooperation.

2         Also, Daniel Zamot was put in the position that

3    resulted in the threat from Artavis Spivey through no fault of

4    his own, they never should have been housed in the same

5    dormitory together.  He didn't ask for that to happen, and when

6    I met with him, I told him that the United States would keep

7    him separate from Artavis Spivey.  For whatever reason, that

8    didn't happen.  But I do want to make clear that this was a

9    definitely unfortunate situation that happened at the St. Lucie

10   County jail, but it was a situation that Daniel Zamot did not

11   ask for, nor was it a situation that he could anticipate.

12        On the other hand, I have to note that at the end of

13   the day, Daniel Zamot was not always truthful with me, Judge,

14   and we heard about that in the last sentencing hearing.  He, at

15   one point, told me that the threat that happened at the St.

16   Lucie County jail was more than a threat and was also a violent

17   assault.  That wasn't true.  Oftentimes when I have cooperators

18   who lie to me, they don't get 5Ks, they don't get 3535(e)

19   motions from the United States.  One the core principles of the

20   cooperation agreement that we have with cooperators, did they

21   tell the truth, they don't lie.

22        In this case, Daniel Zamot did not completely live up

23   to his end of the bargain; however, at the end of the day, I do

24   believe he ultimately told me the truth, and I also believe

25   that what happened at the St. Lucie County jail was a large

```
 1   product of a circumstance that he was put in, through to fault

 2   of his own, that never should have happened.

 3          So I want the Court to understand why I'm not

 4   recommending a greater departure, in this case.  At the same

 5   time, I want the Court to understand why I still am

 6   recommending a departure under 5K and 3553(e), I think Daniel

 7   Zamot did provide substantial assistance to the United States,

 8   and I do think he earned the 5K that we are recommending in

 9   this case; however, the fact that he was not completely

10   truthful with me, I think militates against a larger percentage

11   in the 5K.

12          THE COURT:  So ultimately, the percentage that you

13   calculated that gets you to the 15 months on Count II is what,

14   again?

15          MR. PORTER:  If you look at the bottom of his total

16   effective guideline range, which is 114 months, it is a

17   30 percent departure from that.

18          THE COURT:  Okay.

19          All right.  Thank you, Mr. Porter.

20          I should have mentioned this earlier, but are there

21   any victim statements that you wish to present during this

22   hearing?

23          MR. PORTER:  Yes, Your Honor.  Ms. Shiflet is present

24   and I believe that -- may I have one moment?

25          THE COURT:  Okay.
```

```
 1              MR. PORTER:  Yes, Your Honor, Ms. Shiflet would like
 2   to briefly address the Court, when the time comes.
 3              THE COURT:  All right, I'll make a note of that.
 4              Let me turn to Ms. Militello.
 5              Do you have any evidence you wish to present and, of
 6   course, any argument on an appropriate sentence?
 7              MS. MILITELLO:  I do, Your Honor.  If it is okay with
 8   the Court, I would like to call Dr. Sheila Rapa before I make
 9   argument to the 5K.
10              THE COURT:  All right, let's do that.
11              Dr. Rapa, please make your way to the witness stand
12   over here, remain standing to be sworn in.
13              THE COURTROOM DEPUTY:  Please raise your right hand.
14               SHEILA RAPA, Ph.D., DEFENSE WITNESS, SWORN
15              THE COURTROOM DEPUTY:  Please have a seat.
16              Please state and spell your full name, for the
17   record.
18              THE WITNESS:  Sheila Rapa, R-A-P-A.
19              MS. MILITELLO:  May I proceed?
20              THE COURT:  Yes.
21              MS. MILITELLO:  Thank you.
22                        DIRECT EXAMINATION
23   BY MS. MILITELLO:
24   Q   Dr. Rapa, I filed with the Court a copy of your curriculum
25   vitae that you sent me.  Would you adopt that everything in
```

```
 1   that curriculum vitae is true and accurate, to your knowledge?
 2   A   Yes.
 3           MS. MILITELLO:  Your Honor, that was filed at docket
 4   entry 89-1.  I would now move that into evidence.
 5           THE COURT:  Any objection, Mr. Porter?
 6           MR. PORTER:  No objection, Your Honor.
 7           THE COURT:  All right.  The CV is admitted into the
 8   record.
 9   BY MS. MILITELLO:
10   Q   The Court having a copy of the CV, could you just briefly
11   summarize your educational and professional background?
12   A   Sure.  I received a Bachelor's degree at Palm Beach
13   Atlantic University in 1990.  I went on to receive my Master's
14   degree from Albizu University around 1992.  Then my doctorate
15   in 1999 also at Albizu University.  I did my internship at
16   Miami Children's Hospital.  I worked on the inpatient and the
17   outpatient unit.  And I also did my residency at Atlantic
18   Shores Hospital, which is a totally locked psychiatric
19   facility.
20   Q   What about more recent -- well, how many years have been
21   practicing?
22   A   I got licensed in the State of Florida in the year 2000,
23   and I have been working as a psychologist since the year 2000.
24   I was the chief clinical officer of Chrysalis Health which is a
25   community mental health center.  We had group homes, outpatient
```

1    facilities, day treatment programs, dual diagnosis programs;

2    and I ran all of the clinical aspects of Chrysalis Health.  We

3    probably served anywhere from three to 5,000 people a week, the

4    majority were adolescents or young adults.  And I also, while I

5    was there, wrote a treatment program for juveniles that were in

6    with juvenile justice, and that also had corresponding mental

7    health issues.  So we worked very closely with DJJ and their

8    population, and I presented my treatment program and many, many

9    adolescents went through that program and did well.

10   Q    Just to clarify, because we are in federal court, DJJ is

11   the Department of Juvenile Justice in state court?

12   A    That is correct.

13   Q    Okay.  Now, what is your experience doing evaluations for

14   state or federal court?

15   A    I have been in private practice since I got licensed.

16   While I was working at Chrysalis, I did my private practice

17   part-time.  I did clinical work and forensic work.  As my

18   private practice grew, I had to resign from Chrysalis, and I

19   started doing forensic work 100 percent.  And I do -- I have

20   worked in pretty much every county in Florida, except maybe the

21   Panhandle, and do expert witness testimony and any kind of

22   court-related evaluations.

23   Q    Who hires you as an expert?  Is it always the defense in a

24   criminal case?

25   A    It is not.  At this point in my career, I'm about

1    fifty-fifty hired by the state and hired by defense.

2    Q   Okay.  And I know it's been a number of years since you and

3    I were in state practice, but is it fair to say you have

4    testified against several of my clients before?

5    A   Yes, I have.  I do also the sexual online predator

6    evaluations for the State of Florida.  In that role, I work for

7    the State almost exclusively.

8    Q   In that capacity, is that where you're recommending civil

9    commitment for someone because they are a danger?

10   A   That is correct.

11   Q   Okay.  Did you write an evaluation or psychological report,

12   in this case?

13   A   I did.

14         MS. MILITELLO:  Your Honor, I filed a copy of that

15   report with a motion to seal, and so I believe under seal, it

16   is docket entry 81.  I would -- well, I'm sorry, if I can go

17   back.

18   BY MS. MILITELLO:

19   Q   Dr. Rapa, would you adopt everything you wrote in that

20   report as being true and correct to the best of your knowledge?

21   A   Yes.

22         MS. MILITELLO:  At this time, I would move docket

23   entry 81 into evidence.

24         THE COURT:  Any objection?

25         MR. PORTER:  No objection, Your Honor.

1          THE COURT:  All right.  Docket 81, which is the

2    report of Dr. Rapa, is admitted into the record.  It is sealed

3    and will remain sealed.  There is also a pending motion to file

4    that under seal which this Court hereby grants and will make

5    that clear via a post-hearing order.

6          Let's proceed.

7          MS. MILITELLO:  Thank you.

8    BY MS. MILITELLO:

9    Q   Dr. Rapa, would it be fair to say that this evaluation can

10   sort of be divided into two categories; one, sort of how we got

11   here with Mr. Zamot, and then two, what his prognosis is or

12   treatment options for the future?

13   A   Yes.

14   Q   Okay.  So as to the first piece, did you have an

15   opportunity to review any psychological, medical, educational

16   records relating to Daniel Zamot?

17   A   Yes, I did.

18   Q   Could you briefly tell the Court what records you reviewed?

19   A   Yes, and there were a lot of records for Mr. Zamot.  I had

20   the indictment.  I had the plea agreement, the PSI also, but I

21   had extensive educational records.  I had his individual

22   educational plan for multiple years.  I had his Dorothy Thomas

23   Exceptional Center Student summary, his Avon Park High School

24   transcript.  Then, I also had medical information, records from

25   doctors, records from Dr. Steven Williams, Lakeland Regional,

```
 1   Blake Medical Center; and I had a lot, thousands of pages of
 2   social security records also.
 3   Q    Okay.  Did you meet with Mr. Zamot?
 4   A    I did.
 5   Q    Did you do any testing when you met with him?
 6   A    I did.
 7   Q    Okay.  Let's start with what your diagnoses are, and how
 8   you got to those diagnoses.
 9   A    Okay.  I'm going to get there in my report, so I don't
10   leave anything out.
11         So I diagnosed Mr. Zamot with borderline intellectual
12   functioning, posttraumatic stress disorder, attention deficit
13   hyperactivity disorder, generalized anxiety disorder, and a
14   cannabis use disorder.  All throughout his records and all
15   throughout his time at school, starting by the time he was even
16   like eight, seven years old, he was also diagnosed with bipolar
17   disorder through all of the records, so I added that one in as
18   a provisional diagnosis because I saw it in all his records.
19   However, it is often difficult to tease out PTSD from bipolar,
20   so I stuck with my PTSD diagnosis and added in the bipolar as a
21   provisional.
22   Q    Okay.  I want to talk to you about what these diagnoses
23   mean; and if you would, tell us, as you go through them, what
24   records you relied upon, if any, when reaching these diagnoses.
25         So first talking about the borderline intellectual
```

1    functioning, what does that mean, in practice?

2    A    So borderline intellectual functioning simply means

3    somebody has a low IQ.  Normally, the IQ range is not so low

4    that we can say intellectual disability, but we can say that it

5    is borderline.  That means it is just a few points above an

6    intellectual disability, but it is still an IQ that is

7    considered much lower than the average population.

8    Q    And what was Daniel Zamot's IQ?

9    A    His full scale IQ was 77.  When I looked back in the

10   records from his school, he has been tested multiple times

11   because they had to keep him in special classes and in special

12   school settings, and his IQ throughout was always in like 76,

13   77.

14   Q    And is it true that one's IQ generally does not change?

15   A    Normally not.  I mean, if you use a lot of cannabis, it can

16   go down a few points, especially if you're younger, you know.

17   Sometimes, there is just life lessons that you learn and you

18   will see someone's IQ on nonverbal kind of increase; but in

19   general, your IQ is stable.

20   Q    So your testing was consistent with what you found

21   throughout the school district's testing?

22   A    Yes.  It was exactly what I found in all the records and in

23   my testing, too.

24   Q    Now, you mentioned that he has an IQ of approximately 77.

25   What does that mean in terms of his day-to-day abilities and

```
 1   his outlook on life.
 2   A   Anyone with borderline intellectual functioning, there is
 3   going to be cognitive difficulties in life, meaning what we
 4   normally see affected is your executive functions.  What does
 5   that mean?  That means your planning, your impulsivity, your
 6   ability to have consequential thinking, your ability to make
 7   good, sound decisions.  Sometimes day-to-day is also affected,
 8   in terms of daily living skills, you know, am I able to get
 9   around, am I able to navigate social situations, can I perceive
10   danger, and, you know, will I take risks without thinking of
11   the consequences.  These are all things that are affected when
12   the IQ is low.
13   Q   You mentioned that he had sort of an age equivalent of ten
14   years approximately?
15   A   Yes.
16   Q   What does that mean?
17   A   So what the test does is it tells you, based on somebody's
18   score on their verbal and their nonverbal IQ, where they would
19   kind of fall chronologically; and for Mr. Zamot, what we see is
20   that he falls in the area of like a ten-year-old in terms of
21   how he processes information and his cognitive abilities.
22   Q   Okay.  So would you agree that a ten-year-old can know
23   right from wrong?
24   A   Yes.
25   Q   And there was no insanity finding here, to be clear, right?
```

1  A   Yes, not at all.

2  Q   But that may be someone with a ten-year-old, or Mr. Zamot

3  has more simplistic thinking, less mature thinking?

4  A   Yes, that's correct.  And again, it has to do with even

5  navigating complex social situations or understanding social

6  cues or realizing what situation is risky and what the

7  consequences would be.

8  Q   What about -- and I mentioned I think you had an

9  opportunity to see my motion -- a quote from the DSM-5 that

10 those with intellectual disability or borderline intellectual

11 functioning are more susceptible to -- I'm forgetting the

12 quote -- deviant behavior of their peers?

13 A   Yes.  And what we see with anyone that has low cognitive

14 functioning is that they are extremely gullible.  They are

15 easily led, they are easily talked into things and especially

16 by somebody that they feel is more powerful, somebody they feel

17 is cool, for lack of better word.  They are followers many,

18 many times.

19 Q   And you reviewed much of the discovery in this case and the

20 reports; is that right?

21 A   Yes.

22 Q   Did you see elements of that here?

23 A   I did, and I saw it even when I was talking with Mr. Zamot,

24 so I think that he is somebody that's pretty easily influenced,

25 really wants to be accepted, really wants to feel independent,

1   as most people do that are 18-years-old; but with his cognitive

2   limitations, you know, it is different for him.

3   Q    Now, speaking of his cognitive limitations, do you remember

4   when he first received social security disability?

5   A    Yes, I do.

6   Q    When was that?

7   A    It was -- this was one of the things that caught my eye in

8   all the records for social security because I have looked

9   through many, many social security records in my day and,

10  normally you do not see children getting social security

11  benefits as early as eight-years-old.  His mom started applying

12  for social security benefits by the time he was four.  And

13  school records document, he could not, even in preschool,

14  sustain attention.  He didn't understand what the teachers were

15  saying.  He needed a one-on-one, all of these things, and mom

16  applied.  They did not accept that application until he was

17  eight; but still, at the age of eight, he was already diagnosed

18  with bipolar, he was already diagnosed with ADHD, and he was

19  already diagnosed with low intellectual functioning.  So that

20  stuck out to me in the records.

21  Q    And it stuck out, is it fair to say, because that's rare to

22  have a social security disability grant at such a young age?

23  A    Extremely rare for a young child unless they have really

24  majorly like mental retardation or autism.  So it does speak to

25  the significant mental health issues and behavioral health

1   issues that he had.

2   Q    Now, you have also seen Mr. Zamot's criminal history; is

3   that right?

4   A    Yes.

5   Q    So he proceeded in life without a juvenile criminal

6   history.  So is it fair to say his intellectual disability

7   doesn't wholly explain why we are here today?

8   A    No, I don't think so.  I think that it's a piece of the

9   puzzle.  He was able to pretty much -- I mean, the last grade

10  he completed was eighth grade, so he never even successfully

11  completed ninth grade, and he was placed in special schools.

12  What happens when children are placed into special schools --

13  normally, the special schools are for kids that are acting out

14  and have conduct problems because teachers can't handle that in

15  the classroom, but when you take somebody that has ADHD and

16  that has low intellectual functioning and you put them in a

17  school with other kids that have behavioral problems, they

18  normally start mimicking that behavior and we see an

19  exacerbation.

20        Something good was happening at his home because he

21  was able to stay out of trouble.  We don't see any DJJ records.

22  One the time the police came was because he threw his sister's

23  cellphone; but other than that, we really don't see criminal

24  activity with him which is very unusual.

25  Q    Okay.  Did Daniel Zamot talk to you about the shooting,

1    where he was the victim in his own home?

2    A    He spoke to me about it.  His mother also spoke to me about

3    it.

4    Q    Okay.  And is that where your PTSD diagnosis comes from?

5    A    One hundred percent.  So, you know, somebody showed up at

6    his door and was saying it was a Domino's Pizza delivery at

7    1:30 in the morning.  The mom didn't want to answer the door

8    because she knew that nobody had ordered the pizza; but the

9    door wasn't fully locked, and the guy was able to barge in and

10   immediately start shooting Daniel six times, hit his lung, he

11   had a finger amputated and he has a rod in spine.  Severe,

12   severe injuries, he was hospitalized for a long time.  He

13   definitely shows every sign and symptom of post-traumatic

14   stress disorder.

15   Q    When are those signs and symptoms?

16   A    For him, nightmares, flashbacks, emotional numbing, not

17   wanting to talk about it or be involved or anything, you know,

18   that has to do it.  When we are talking about that the

19   codefendant had a gun, it was the first thing that he said to

20   me, "I don't like guns, I don't want to be around guns, I don't

21   want anything to do with guns;" and that's normal for somebody

22   who has had a trauma.

23   Q    Does PTSD impact someone's decision-making, or could it?

24   A    I don't know for sure.  I mean, because what will happen is

25   you're reacting to things out of your trauma, and out of your

1    fear, so your decision-making would not be as clear if you had
2    not been traumatized.
3    Q    Okay.  And from what Daniel told you, do you think that
4    PTSD affected his decision-making in this case?
5    A    I think it did.  I mean, I think he said clearly that
6    Mr. Spivey was threatening, interestingly.
7              When I was talking to his mother, his mother said
8    that when Daniel first met Mr. Spivey, that he had turned off
9    his phone.  And she said, "He never turns off his phone;" it
10   was very weird she couldn't get ahold of him, that his phone
11   was off.  And she was able then to make a phone call and it
12   went through; and when he picked up the phone to talk to her,
13   Mr. Spivey was in the background saying, "Hang up the phone,
14   you are not talking to her, close that phone," and she said he
15   did, he closed the phone.
16             So I mean, I think there was an element of
17   intimidation, an element of maybe he wanted to hang around with
18   him because this guy did seem powerful; but in the end, there
19   was some fear there.
20   Q    What other diagnoses other than the post-traumatic stress
21   disorder and the borderline intellectual functioning did you
22   come up with?
23   A    So ADHD and that was by history, that was his first
24   diagnosis when he was literally four-years-old; and they
25   actually started him on psychotropic medications by the time he

```
 1   was six -- so very young -- and he has been through every kind
 2   of medication you can imagine.
 3            I really don't know if ADHD was the proper diagnosis
 4   back then.  I really think he was abutting bipolar, but they
 5   always start with the ADHD first.
 6   Q    To your knowledge, is Mr. Zamot on medication now?
 7   A    I don't remember.  I know he has been on medications, but
 8   every medication that he was on had adverse effects; and so I'm
 9   so sorry, I don't recall off the top of my head.
10   Q    Do you believe he needs evaluation from a psychiatrist to
11   see if medication is appropriate?
12   A    A hundred percent, I think that someone with his
13   background, and I do believe he has bipolar disorder, even the
14   PTSD, the anxiety that he feels -- would do very well to be
15   medicated.
16   Q    What are the other diagnoses?
17   A    So I gave him generalized anxiety disorder.  Actually,
18   while I was interviewing him and we were together a long time,
19   three-and-a-half hours or so, he was shaking, like he was so
20   anxious to be in the room with me that his body was trembling;
21   and when he and I talked about that, he said that is something
22   that he experiences off and on and has.  I think it was over an
23   above what I saw with the PTSD, and that's why I gave him that
24   diagnosis.
25   Q    You also diagnosed him with cannabis use disorder?
```

1    A    Yes.  He stated that around the time that his psychotropic

2    medications, he had stopped them -- and I know that he had

3    stopped them because of the adverse effects and they do have a

4    lot of side effects unfortunately -- that he started smoking

5    marijuana and he said, "Really, it just kind of helped with my

6    anxiety."  But I gave him a substance use test and it does show

7    that he has a mild substance use disorder and was likely

8    relying on that to tweak the anxiety, to tweak the PTSD, but

9    there is more appropriate medication that can do that.

10   Q    Okay.  As part of your experience and history, have you

11   conducted risk assessments or dangerousness assessments?

12   A    Yes.

13   Q    Is it fair to say a large number of them?

14   A    Yes, all the time.

15   Q    All right.  And I guess that's probably part of your work,

16   as you said, for the State of Florida when you are recommending

17   civil commitment for persons; is that right?

18   A    That is correct.  You have to do a static and a anti-risk

19   for each of those.

20   Q    Now, you didn't do a full risk assessment for Mr. Zamot; is

21   that correct?

22   A    That's correct.

23   Q    But you're familiar with the sort of things that would

24   raise or increase someone's risk or decrease them.

25   A    Yes.

```
 1  Q    Okay.  Now, is it fair to say you are also familiar with
 2  what the research says about recidivism and the individuals,
 3  from a scientific perspective, that are most likely to
 4  recidivate?
 5  A    Yes.
 6  Q    And then you mentioned Chrysalis Health and that you worked
 7  with mostly young people.  I mean, tell us the age group that
 8  you were personally treating at Chrysalis or that Chrysalis was
 9  treating you were in charge of primarily?
10  A    Yes.  I think that the majority of the people that are
11  being served at Chrysalis are probably between the ages of 13
12  and 25.
13  Q    Okay.  So Mr. Zamot fits within that criteria --
14  A    Yes.
15  Q    -- as someone that you have clinically been treating for
16  decades?
17  A    Yes.
18  Q    From your practical experience as well, do you have sort of
19  a good idea -- of course, you can't predict the future, but who
20  is more likely to succeed and those who aren't?
21  A    Yes.  So there is a number of factors that we would look
22  at.  First of all, we would look at does he have
23  characteristics of antisocial personality disorder?  Do we see
24  somebody that flaunts rules, that doesn't care about other
25  people, that does whatever they want to do and nothing seems to
```

```
 1    deter that?  We do not see that in Mr. Zamot.  He has no
 2    evidence of antisocial personality disorder whatsoever, even
 3    though what he did was antisocial.  He does not have a pattern
 4    of that behavior.
 5            He also has a very strong family unit.  I spoke with
 6    his mother.  He has got siblings, they are all very close, and
 7    the mother is very close in terms of supervision of him, from
 8    what I could tell after interviewing her, so that is a
 9    protective factor for him.
10            He really doesn't go out and do hard drugs and
11    alcohol.  He uses marijuana to a mild degree, is what the
12    testing showed, that's another thing, that's a benefit for him.
13    And really, he got into no trouble other than when he met
14    Mr. Spivey and really spiraled down those five days.
15    Q    And so you made some treatment recommendations for
16    Mr. Zamot, could you tell the Court about what those
17    recommendations are?
18    A    Sure.  He does need -- he does need treatment.  There is no
19    question that he has never had any appropriate treatment for
20    his post-traumatic stress disorder.  Very strange that he would
21    have a crime such as that and that there weren't any victim
22    services coming forward and putting him in therapy, but his mom
23    said no, there were none.  So he absolutely needs specific
24    evidence-based treatment for his PTSD.
25            He also needs proper medication and proper treatment
```

1    for his bipolar disorder.

2           For him, it's going to be a little bit different

3    because you are not only going to have to find evidenced-based

4    treatment, you are going to have to find evidence-based

5    treatment that can also accommodate his lower IQ.  It is out

6    there, but it is a speciality in the community, so he will need

7    that.

8           When most people join therapy or do CBT or cognitive

9    behavior therapy, they have IQs of 80 or higher, and that's

10   kind of how they work that treatment.  So if your IQ is less

11   than that, then you do need specific treatment tailored for

12   that specific IQ.

13   Q   What other treatment, if any, would you recommend?

14   A   I wanted him to be able to get peer group stuff.  I would

15   love for him to be in a peer group where he can talk about

16   things that are going on in his life, they can provide some

17   guidance for him.

18          He is going to need accommodations in the workplace

19   because the workplace is going to be a struggle for him, as

20   workplaces move very fast and you have to you multitask, so he

21   will need accommodations for that.  And, you know, he has to be

22   given very concrete and predictable tasks.

23          I think I covered everything.  I'm looking, though.

24          Oh, also behavior modification I put in there.

25   Again, behavior modification geared to him specifically where

```
 1    he will learn coping skills; refusal skills, very huge for him;

 2    social skills training with assertiveness.  This is --

 3    Mr. Zamot is someone who struggles with assertiveness; like he

 4    would like to be assertive and then he pulls back.  We see that

 5    with what happened in the jail, okay, I'll play cards with him,

 6    I'll try to placate him because I'm not quite sure how to

 7    navigate the social situation, and social skills training would

 8    really help him with that.

 9    Q    Are you aware of training like, through, locally the Segal

10    Academy or Archways in Broward that work with people of either

11    intellectual disability or borderline intellectual disability?

12    A    Yes.

13    Q    Do they teach some of those social skills and other things

14    that you are discussing?

15    A    They do, and that is their main focus.

16    Q    Okay.  And so do you think Mr. Zamot would benefit from

17    working with one of those programs?

18    A    Yes.  I think he would do very well in one of those

19    programs.  He would do very well in a day treatment program,

20    and then step down to something that is outpatient.  I see no

21    reason why he wouldn't be successful.

22    Q    Okay.  Did you talk to Daniel about this offense and what

23    he specifically did to the victim in this case?

24    A    Yes.

25    Q    And what did Daniel tell you?
```

```
 1   A    I'll have to go back and refresh my memory, if I don't
 2   remember everything, but that he -- that Mr. Spivey said, We
 3   are going to rob a car, or grab a car, and he went with him.
 4   He said he stood at the back of the car while Mr. Spivey is the
 5   one that brandished the handgun that pulled her out of the car,
 6   that got her stuff.  At some point, I think that Mr. Spivey
 7   handed him her phone, so he had her phone, I believe, and then
 8   he was a passenger in the car.
 9   Q    Did he express to you any remorse for what happened?
10   A    He did, he even teared up, he said, "I feel terrible."
11   What was interesting was he was able to abstract to me, to say
12   to me, "I would hate for something like that to happen to my
13   mom or my sisters.  I can't even imagine that happening to
14   them, and I can't believe that I did this."  And so he showed a
15   lot of remorse to me.
16   Q    Does that remorse or insight or empathy tell you anything
17   as a psychologist?
18   A    You know, remorse doesn't necessarily have anything to do
19   with risk of recidivism; however, as a psychologist, I love to
20   see somebody take responsibility and have remorse for their
21   actions.  They are way more likely to not repeat an action that
22   they feel ashamed of or realize was horrendous, just like in
23   this case.
24   Q    Did Daniel show that shame?
25   A    He did.
```

1    Q   Is someone like Mr. Zamot, with these diagnoses that you

2    have discussed and he has never been in prison before, is there

3    any research about their vulnerability in prison?

4    A   Yes.  We have already seen an example of that while he was

5    in jail and when he was threatened, and he wrote the letter.

6    He did the right thing, he didn't send the letter; but you can

7    tell that he was susceptible to it, like he didn't know how to

8    handle that situation.

9          And many times in correctional settings, you have

10   people that are antisocial personalities and they are able to

11   pick out the vulnerable.  They are able to pick out the ones

12   that are the more gullible, the ones that will do what they

13   tell them to do.  And so Daniel is one of those people that

14   could easily be picked on.  I don't think it was any

15   coincidence that Mr. Spivey targeted him.

16   Q   And did you see from the records, does Daniel Zamot have a

17   history of being bullied and picked on?

18   A   He does, all through his elementary and middle school

19   years, even to the point where -- I don't remember if it was

20   elementary or middle school, but he actually had a teacher that

21   would keep him outside the classroom, not let him go in the

22   classroom and then would let him.  As Daniel was sitting on the

23   bench, the teacher would be saying to him, "You are no good,

24   you are never going to make anything of yourself, I don't know

25   how your mother loves you, you are worthless."

1          Luckily, one day, Daniel actually recorded the

2    teacher and the mom was able to hear the recording that this

3    teacher was saying to this child, and the mom was able to take

4    it to the PTA to get the teacher fired.  But when we are

5    talking about bullying, it is bad enough to be bullied by your

6    peers, but to be bullied by the teachers that are supposed to

7    protect you and help you is at a different level.

8    Q    When it comes to Mr. Zamot, what is your sort of prognosis?

9    Do you think there is a chance that this Court will ever see

10   him again?

11   A    Yes.  I really don't believe this Court or any court will

12   ever see him again.  I think that if we put the proper services

13   in place and he is on the proper medication and he gets that

14   social skills training, I really do believe this isn't someone

15   that has a pattern of criminal behavior.  He doesn't have

16   criminal thinking, so I really don't believe this is something

17   that will be repeated.

18   Q    Can you think of something material that I haven't asked

19   you about that you think the Judge should know about Daniel?

20   A    I don't think so.  I think you covered it.

21          MS. MILITELLO:  Thank you.  That's all I have.

22          THE COURT:  Mr. Porter?

23                      CROSS-EXAMINATION

24   BY MR. PORTER:

25   Q    Good afternoon, Dr. Rapa.

```
 1   A    Hi.
 2   Q    I don't have many questions for you, certainly not as many
 3   as Ms. Militello.
 4            You evaluated Mr. Zamot in preparation for your
 5   testimony today?
 6   A    Correct.
 7   Q    You spent several hours with him?
 8   A    Yes.
 9   Q    Based on your evaluation of Mr. Zamot, do you believe that
10   he has the capacity to appreciate right from wrong?
11   A    I do.
12   Q    Do you believe he recognizes that his conduct in this case
13   was wrong?
14   A    Yes, sir.
15   Q    You talked about, with Ms. Militello, several of the
16   diagnoses that you made in this case?
17   A    Yes.
18   Q    One of them was that you diagnosed Mr. Zamot with
19   borderline intellectual functioning?
20   A    Yes, sir.
21   Q    And a product of that condition is that that makes him more
22   susceptible to manipulation from his peers.
23   A    Yes.
24   Q    Based on your evaluation of Mr. Zamot and the time you
25   spent with him, is that ever going to get better for him?
```

```
1    A    His IQ will not change, so in terms of his IQ and always

2    being diagnosed with borderline intellectual functioning, that

3    will stay the same; however, we can teach social skills, we can

4    teach refusal skills, we can teach consequential thinking and

5    he just never had the opportunity to learn any of that in an

6    appropriate setting.

7    Q    In your opinion, what does he need so that if he is faced

8    with the same situation again, in the future, he is able to

9    stand up and say, "No, I'm not going to do that"?

10   A    It is a great question.  I do think it's going to come in

11   the form of social skills training.  I think what we see with

12   him is that he was able to turn a corner, like he was doing

13   everything that Mr. Spivey told him to do; then, he gets into

14   jail, Mr. Spivey tells him to write the letter; he does, but he

15   doesn't send it.  So already there is a little bit of learning

16   there, right, a little bit.

17             So I think with the appropriate teaching and the

18   appropriate guidance, I think he will learn social skills and

19   refusal skills and how to think through something before he

20   acts.

21             MR. PORTER:  Thank you, Dr. Rapa.  Thank you for your

22   time.  Judge, that's all I have.

23             THE COURT:  Thank you, anything further?

24             MS. MILITELLO:  Not from Dr. Rapa.  Thank you.

25             THE COURT:  All right.
```

```
 1              Thank you, Doctor.
 2              THE WITNESS:  Thank you.
 3         (Witness excused)
 4              MS. MILITELLO:  As the Court can see, Daniel Zamot
 5    has many family members who are present today, they are all
 6    crying.  One of his brothers is going to speak, but he is
 7    crying right now.  I think his oldest sister, Myriam Camacho,
 8    would like to address the Court.
 9              THE COURT:  All right, Ms. Camacho.
10              Good afternoon.
11              THE WITNESS:  Good afternoon.
12              MS. MILITELLO:  If it is okay with the Court, I was
13    just going to let her speak to the Court.
14              THE COURT:  Yes.
15              Just make whatever statement you wish to, ma'am.
16              THE WITNESS:  He is always -- like the other kids are
17    mine and I have raised them together.  He always spend the
18    night at our house.
19              I have always been strict with my kids, and he was
20    always a good kid.  He never came out of the house, that's why
21    he doesn't have any criminal history.  He has always been a
22    good kid, so it was shocking to us what he got into.
23              And that was all I wanted to say.
24              THE COURT:  Thank you, I appreciate it.  Please tell
25    me your full name again, ma'am.
```

```
 1              THE WITNESS:  Myriam Camacho.
 2              THE COURT:  How are you related to --
 3              THE WITNESS:  I'm his older sister.
 4              THE COURT:  Thank you.
 5              THE WITNESS:  Thank you.
 6              MS. MILITELLO:  Your Honor, this is Cassandra O'Neil,
 7    who is approaching.
 8              THE WITNESS:  How are you doing?
 9              THE COURT:  Good afternoon, Ms. O'Neil.
10              We need to be able to hear you clearly, so I know
11    this is difficult, but try to speak up.
12              THE WITNESS:  Okay.  Well, I'm his big sister, I'm
13    the third oldest.  I'm just -- first off, I want to say I'm
14    sorry for everything you dealt with, too, because I don't know,
15    I can't -- I don't know really what to say.  My mom did not
16    raise us like this.  And it is his whole life, he's an
17    18-year-old, but, like, he is a baby and it's, like -- I'm not
18    making this excuse because he is my little brother, it's, like,
19    actually I watched him, watched him grow and he don't have that
20    mind of a 18-year-old.  Like, I'm just -- I'm just -- I'm just
21    stunned, I'm just confused, you know what I'm saying?
22              I feel bad because I'm the big sister and I feel like
23    I should have put more effort into paying attention because my
24    mom don't let us go nowhere, like she is more of a parent, she
25    is always there for us.  My mom is a single mother of six kids
```

```
1    and she made sure that something like that we would never do.
2    Like, she always taught us, we want something, you go get it,
3    you know what I'm saying, you get it the right way.  You want
4    something, you want money, you go get a job; you don't go out
5    there and you don't harm people, you know what I'm saying.
6            Like he said, that could have been me, that could
7    have been my mom, that could have been anybody, you know what
8    I'm saying?  It's just -- I'm just lost by words and it just --
9    it hurts so bad.
10           He got -- he is a baby, you know what I'm saying?  He
11   is just like --
12           I don't know, you just hurt me.  You really broke my
13   heart, Bro.  And no telling what is going to happen, you don't
14   even deserve to be in there.
15           I feel like I failed.  All your siblings feel like
16   they all fucking failed.  I'm starting to curse, but everybody
17   feel like they failed all because we think he is outside
18   playing basketball trying to make friends.
19           You got siblings, you don't need no friends.  You
20   have siblings that care for you, siblings that would never put
21   you in no position like that.  You want something, we would
22   give it to you.  I don't know, I'm just lost by words, Bro;
23   like you really hurt my feelings.  My head hurts, all of this
24   like.  I already knew not to wear no lashes in here, I already
25   knew this was going to hurt me.
```

1              I love you to death, you feel me.?

2              THE DEFENDANT:  Me, too.

3              THE WITNESS:  I just -- I wish you would have been

4    more smart and don't cut your phone off, call us, talk to us,

5    tell us stuff.  You tell us everything else, why wasn't this

6    something you tell us?  We would have done everything to

7    protect you.  We all we got.  We all we got, we don't have a

8    big family.  We don't come from a big family, we all we got,

9    and that's something you kept from us.  We could have protected

10   you.  We could have got you from that position.  We wouldn't

11   put that lady in that position.

12             Baby, I know that you ain't mean to do that, you know

13   what I'm saying?  I know you were scared, I know, I know.  I'm

14   your sister, I know you were scared.

15             That's all I got to say.

16             THE COURT:  Thank you.

17             MS. MILITELLO:  All right, Your Honor.

18             THE WITNESS:  I'm sorry.

19             MS. MILITELLO:  I think those are the only witnesses

20   we will call today, but the Court heard earlier from Ms.

21   Flores, Mr. Zamot's mother.  She is present, she is supportive,

22   if the Court would allow me to proffer that.  I think she is

23   not ready to speak with the Court.  One of his brothers is

24   here, as well.  I know they are all very supportive of Daniel

25   and will do everything they can to make sure nothing like this

```
 1   happens again.

 2              THE COURT:  All right.

 3              Ms. Militello, do you want to offer your particular

 4   argument on an appropriate sentence?  You can do that now,

 5   please.

 6              MS. MILITELLO:  Thank you.

 7              Does the Court want me to go to the podium?

 8              THE COURT:  As you wish.

 9              MS. MILITELLO:  As to the 5K, because I think that's

10   pending first before the Court, and I know the Court hears us

11   say this often, but it is true, within the Southern District of

12   Florida, the recommendations that we are seeing here, in Fort

13   Pierce, are unique and I think that creates somewhat of an

14   unwarranted disparity.  Sort of the unofficial rule is that if

15   someone cooperates, they normally get a third off.  If they

16   testify, they would get half off.  And if they were threatened

17   or suffered a threat, it would be greater than that.

18              And I understand that there are issues the government

19   has concerns about.  I think we have all shared our amounts of

20   guilt.  I was in trial the week Mr. Zamot called his mother and

21   tried to reach me, and so the threat that occurred was not

22   conveyed until my trial ended.  And, of course, that's no

23   excuse for Daniel to exaggerate the threat and the assault, but

24   I wonder if it had been reported more quickly, you know, if we

25   would have gotten a truthful statement from day one.
```

```
 1              But what I can tell the Court is, while his statement
 2    was exaggerated about the threats, he has been consistent with
 3    the FBI and with the government, as it relates to what happened
 4    in this carjacking from that initial meeting.  And he has given
 5    several meetings, and it was because of his cooperation that he
 6    was targeted by his codefendant.  And it was because of his
 7    cooperation that he called his mother panicking.  She then
 8    called me at least a dozen times asking why she needed to move
 9    and what happened; and then, of course, why we reported this.
10    And so in our minds a threat, and as the Court found, certainly
11    took place and Daniel is learning from it.  But he simply did
12    not have the skills.
13              And it's a double-edged sword because he has never
14    been to prison before, doesn't have the skills to navigate the
15    prison life.  And I say that it's double-edged because there is
16    always some fear for someone who goes to prison because there
17    is some amount of survival that has to occur.  And he will have
18    a target on his back because of this cooperation.  This was not
19    conducted under seal.  The government's 5K motion has been
20    filed publicly, he now testified publicly.  There has been
21    evidence that his codefendant is in a gang.  There is evidence
22    that a specific member of that gang is not in custody and has
23    already -- that threat occurred against Mr. Zamot's family, and
24    so those threats are ongoing and likely only to be continued
25    once he is sent to the BOP.
```

1          I'm sure the Court knows it is routine that

2     defendants ask for copies of their docket sheets, it is because

3     other inmates are threatening them, they want to know if there

4     is a 5K on the record, and there will be one in Daniel's case.

5          So I know that the Court is aware threats is a

6     consideration under the guidelines.  But so this isn't an

7     instance where he simply publicly put himself out there, he did

8     so at great personal risk and risk to his family.  And so I

9     would submit to the Court that this percentage the government

10    is requesting is insufficient and that the Court should depart

11    greater than their recommendation.  And I leave it to the

12    Court, really, how that is done.  Of course, I think the Court

13    could depart solely on Count II or could depart on Count 1 and

14    Count II, but the 30 percent I think is insufficient; and as I

15    mentioned to the Court, normally we would see with public

16    testimony closer to 50 percent, and then with this case the

17    substantial threats that have already occurred, I think it

18    would be well within the Court's discretion to grant above a

19    50 percent.

20          THE COURT:  All right.  Thank you.

21          Mr. Porter, anything further with respect to the

22    extent of the departure and the credibility issues that you

23    explained have informed the 30 percent proposal?

24          MR. PORTER:  Not with respect to the motion for

25    downward departure, Judge.

1          THE COURT:  All right, thank you.

2          Okay.  So turning first to the motion for downward

3    departure under 5K1.1, to reflect Mr. Zamot's substantial

4    assistance, I'm going to grant the motion.  I do find the

5    defendant has substantially assisted the government in this

6    case, including with his testimony earlier today during

7    sentencing of his codefendant Mr. Spivey.

8          With respect to the extent of the departure, I do

9    believe under the circumstances the government's proposal is

10   fair and reasonable, given the inconsistencies in Mr. Zamot's

11   testimony during the various meetings that he had.  And so

12   while it's certainly encouraging that he ultimately came clean

13   fully and was honest, it didn't happen without certain detours

14   in truthfulness, and I think that has to be factored in.  So

15   for that reason, I am satisfied with the government's proposal.

16         So what I'm going to do is grant the 5K1.1.  I'm

17   going to limit it to Count II; and so having exercised my

18   direction under 3553(e), I do believe there is authority to

19   sentence Mr. Zamot on Count II below the mandatory-minimum

20   sentence of 84 months, which would get us to the 50-month mark

21   using only substantial assistance as the basis for that

22   reduction.

23         So now let's turn to any discussion about a downward

24   variance on Count I.

25         MR. PORTER:  Judge, this is a difficult case.  Your

1    Honor has heard a lot of testimony this morning.  I kind of see

2    this case as the tale of two different stories.  Mr. Zamot does

3    have, I think, a much different story than Mr. Spivey does.

4            I don't usually start a sentencing recommendation

5    with my analysis of mitigating factors, but I believe that they

6    are present in this case more so than other cases, so I want to

7    take the time to talk about them before I talk about the

8    aggravating factors that I think are present.

9            I acknowledge that Mr. Zamot is young.  He is 18

10   years old, and he has no criminal history.  This is his first

11   criminal conviction.  Now, I think that there is another side

12   of that coin.  He certainly chose to dive in to the deep end of

13   the pool, when it comes to the gravity of his criminal conduct.

14   Most people do not choose armed robbery as their first foray

15   into the criminal justice system.  So I think that that factor

16   kind of cuts both ways, but I do want to acknowledge that he

17   does have a lack of criminal history and he is very young, and

18   I think that bodes well for him in the future.

19           I do have a lot of hope for Mr. Zamot.  I think that

20   he has the ability to turn things around.  I think that he does

21   need a lot of the treatment that Dr. Rapa discussed and

22   testified to, and I hope that he gets that treatment, either in

23   BOP or especially when he gets out because I think that he will

24   benefit from it.  I do think that Mr. Zamot is someone that can

25   turn his life around.  I also think that he is someone that can

1    be a productive member of society, when he does get out.

2           I also think it is important to acknowledge his role

3    in the offense vis-a-vis his codefendant.  I don't think that

4    there is any question that Artavis Spivey was the ringleader,

5    so to speak, with respect to this carjacking; and I think it is

6    fair to say that Daniel Zamot followed Artavis Spivey all along

7    the way with respect to this carjacking.  The problem is there

8    were several opportunities for Daniel Zamot to turn back, and

9    he never took any of those opportunities.

10          He did not have to engage in this armed carjacking.

11   There were a lot of opportunities he had.  There were several

12   points, several times where he could have simply said no, and

13   he didn't.  So I want to acknowledge that he did, for the most

14   part, follow Mr. Spivey with respect to this crime; however, at

15   the same time, Judge, he was there when Artavis Spivey pulled a

16   firearm on Jennifer Shiflet, ordered her out of her car and

17   threatened to shoot her.  He stood right there, right there

18   behind the car.  So that -- those actions are more than someone

19   who is just along for the ride, he was part and parcel of it.

20   Actions have consequences, and for me, that's what this case is

21   about.

22          When we turn to the 3553(a) factors, and I don't

23   think Ms. Militello and I have much disagreement on the facts,

24   it is just that I think the aggravating factors in this case

25   outweigh the mitigating factors to the extent that with respect

1    to Count I, a downward variance is not appropriate, and a

2    sentence at the bottom of Mr. Zamot's advisory guideline range

3    is warranted.  The reasons I believe that, first and foremost,

4    the nature and circumstances and seriousness of the offense.

5              Daniel Zamot and Artavis Spivey robbed a woman at

6    gunpoint, stole her car, stole her -- attempted to steal money

7    that she didn't have, stole her phone, drove off with the car

8    and ultimately crashed it.  This was a callus disregard for

9    human life that they both engaged in.  And I understand that

10   Daniel Zamot was not the one who pointed the gun at Ms.

11   Shiflet, he is not the one who ordered her out of the car, but

12   he played a substantial role in it; and for that, I think he

13   needs to be held accountable.

14             A strong message still needs to be sent in this case.

15   No matter how you spin this, no matter how you look at it,

16   Daniel Zamot went along with Artavis Spivey to conduct an armed

17   carjacking.  That armed carjacking had terrible consequences,

18   and an enormous impact on the victim, Jennifer Shiflet, and

19   because of that; one, Mr. Zamot needs to be held accountable;

20   and two, a strong message needs to be sent that if you engage

21   in this type of conduct, there will be consequences for your

22   actions.

23             I don't think that there is as strong of an argument

24   in Daniel Zamot's case for specific deterrence because I do

25   think that once he gets out, with proper treatment, I think

```
 1   that he can succeed and become a productive member of society;
 2   however, when dealing with crimes of violence, crimes of this
 3   magnitude, there is a profound need for general deterrence, a
 4   profound need to send a message to the public that if you
 5   engage in this type of conduct, there will be a price to pay,
 6   and there will be a deprivation of liberty for you at the end
 7   of the road.
 8            For those reasons, Judge, the United States submits
 9   that, while there are mitigating factors that are present, they
10   are outweighed by the gravity and the severity of the crime
11   that Mr. Zamot engaged in; and because of that, the United
12   States is recommending a sentence at the bottom of his advisory
13   guideline range in Count I.
14            THE COURT:  Okay, thank you.
15            Perhaps we could have the victim, if she wishes to
16   make a statement now do so.
17            MR. PORTER:  Yes, Your Honor.
18            THE VICTIM:  I just wanted to say directly to you
19   that day that you involved yourself in all of that turned my
20   life upside-down.
21            THE DEFENDANT:  I'm sorry.
22            THE VICTIM:  And I'm still trying to recover from
23   that, but I want you to know that I hold you accountable for
24   what you did that day; but, in another way, I don't hold you
25   accountable because I do realize and I could even see it that
```

1    day that you were a follower.  I could tell that you were going

2    with the flow, going along.

3         I do believe that you need to be held accountable,

4    for what you did because I have to deal with the consequences,

5    so I feel you should have to deal with the consequences, as

6    well.

7         I do want you to take this opportunity to take in

8    every little bit of help and guidance that you can.  I see your

9    family back there.  I can tell that you have a very strong

10   family bond, and that right there for you is probably going to

11   be half your battle to have that support.  Take what they are

12   going to give you in here and in here (indicating), and do the

13   right thing in the end and I guarantee if you do that, you will

14   be very successful in life.

15        Thank you, ma'am.

16        THE COURT:  That's okay, thank you.

17        THE DEFENDANT:  I'm really sorry.

18        THE COURT:  All right.

19        Ms. Militello, I understand you have a motion for

20   downward variance which I have reviewed.

21        MS. MILITELLO:  Thank you.  I'll be brief because

22   most of my arguments are made in writing, in my motion for

23   downward variance, and I would adopt that pleading.

24        You know, I agree with the government, it is telling

25   that Daniel Zamot sits before the Court at only 18 which is

```
 1    young for a federal defendant but with no criminal history
 2    which is why I hired Dr. Rapa to sort of figure out "how did we
 3    get here" because this isn't the pattern of escalating behavior
 4    that, frankly, we normally see and maybe was apparent with the
 5    codefendant.  We have someone who sits at home, by all accounts
 6    all day long, plays video games, plays basketball, has
 7    difficulty in school, and then suddenly, they are participating
 8    in an armed carjacking.
 9           And through my conversations and our debriefs, it
10    wasn't surprising when we learned Mr. Zamot's IQ, that it's low
11    and in the borderline intellectual disability range; that he
12    has been receiving social security since he was
13    eight-years-old, that is very rare; that he had IEPs, which are
14    individualized education plans, because he could not succeed
15    and keep up with kids and peers his age.  But that doesn't
16    wholly explain, of course, why we are here, but I think that
17    the PTSD is a big piece of that because Daniel was shot six
18    times in his own home because another kid in the neighborhood,
19    another teenager, was upset over some feud about a phone or
20    video game and chose to come into his home and shoot him.
21           And Daniel, having barely survived that, still has a
22    rod in his body, still has pain, I think acted out of that fear
23    and that trauma, when he participated in this offense, and
24    that's not an excuse because I think the last thing he wants to
25    do is transfer his own fear and trauma to someone else, but I
```

 1    do think it helps explain what happened, that when Spivey came

 2    to his house where he lived with his mother and his sister and

 3    said he would shoot them, that Daniel knew what that meant

 4    because he had already been shot in that apartment before.  And

 5    he didn't want his family to go through what he went through.

 6            And, of course, I don't mean to say this like we are

 7    not accepting responsibility, we are.  Coercion is a defense.

 8    We didn't proceed with that defense at trial; instead, from day

 9    one in federal court, he admitted what he did was wrong, but he

10    is explaining and explained to us why it happened.

11            That decision was not fully rational.  He could have

12    left.  I provided to the Court in the memorandum, and I hope

13    the Court saw the digital copy because the color photos are a

14    little more clear, but they walked all around town, right, so

15    there was opportunity for him to leave, and there was

16    opportunity for him not to participate.  So his decision was

17    not fully rational or justifiable, but I do think that fear was

18    the motivator and the desire to protect his family.

19            THE COURT:  There was also the burglary that I

20    understand the defendant testified to today.

21            MS. MILITELLO:  Yes, and, you know, that put us in an

22    awkward position because that was one of the things that came

23    out in the debrief, that we agree normally would not come

24    before Court as part of sentencing.  Frankly, the government

25    didn't know about it before Mr. Zamot discussing it, and we

```
 1    wanted to give them information to hopefully close another case
 2    to get that victim her gold coins back that were found in this
 3    vehicle.  I didn't want to cut the government off, I'm sure
 4    they are going to tell the court, the Court should not --
 5            MR. PORTER:  Judge, it was pursuant to a Kastigar
 6    letter.  It is not my practice to withhold stuff, information
 7    from the Probation Office, but that statement was made pursuant
 8    to a Kastigar letter, that's why it was not disclosed.  When
 9    Mr. Zamot made that statement, I had agreed that anything that
10    he told me would not be used against him.  So I want the Court
11    to understand why that wasn't disclosed to the Probation
12    Office.  However, when I made the decision to put Mr. Zamot on
13    to testify, I felt like I had an obligation to disclose that to
14    Mr. Rodriguez, and so that's how it came out.
15            THE COURT:  Understood.
16            MS. MILITELLO:  But so there, again, right, Mr. Zamot
17    took full responsibility.
18            To give the Court the complete timeline, just in case
19    it was unclear, they did go -- they did this burglary.  No one
20    was home, they went into this home.  He then, as he testified,
21    went home and showered, did not want to go out with Mr. Spivey
22    again, right, was going to stay in his apartment and that's
23    when Mr. Spivey said, "You come with me or I'm going to shoot
24    your family."
25            So when we talk about influence of deviant peers,
```

1    right, and knowing right from wrong, I would submit to the

2    Court, Daniel Zamot knew hanging out with Spivey was not the

3    right decision, right, and he shouldn't go along with him which

4    is why he initially told him no, and he only changed his mind

5    when his family was threatened.

6            THE COURT:  All right.

7            MS. MILITELLO:  One of the things that I think is

8    important here is the guidelines.  They don't distinguish

9    between the fact that Mr. Spivey is the one who brandished the

10   firearm and that Daniel was there, and that Daniel was the

11   follower.  They don't distinguish for what I think is a

12   significant aggravator in that respect.  Their roles were not

13   the same; but if their criminal histories were the same, right,

14   the guidelines would be the same.

15           And, of course, Mr. Spivey got enhancements for his

16   flight after and the obstruction; but otherwise, their

17   guidelines would have been the same in terms of offense level.

18   The guidelines don't differentiate for the fact that I think

19   their role in this offense was very different, so I would ask

20   the Court to consider that, which isn't to say, of course,

21   participating was serious.  I don't mean to mitigate that, but

22   there is a difference between the person who actually

23   brandishes the firearm, who threatens the words to harm

24   someone, and then someone else who is just present.

25           And then, of course, as the Court knows, being that

```
 1    this is his first offense, statistically, he does have the
 2    greatest chance of success.  I think the fact that his family
 3    is here, that they have promised me -- Dr. Rapa I am sure would
 4    let me proffer to the Court, they will continue to support him,
 5    to monitor him, to keep him out of the trouble.  They did not
 6    know about the PTSD diagnosis.  I'm not sure they had a full
 7    handle on the breadth of his mental health issues.  I think the
 8    Court heard that from the sister, I don't think they fully
 9    understood.  Hopefully, now, right, that can be changed.
10          I don't -- I'm going to ask the Court to make some
11    recommendations as to the services he receives from the BOP.  I
12    think he is unlikely to receive exactly what he needs because
13    of the difficulties Dr. Rapa described; but hopefully, when he
14    is out on supervised release, he can get them.  I know
15    Probation has a contract with Archways in Broward.  There are
16    local options.  Segal is the group in Palm Beach County with
17    the janitorial staff.  They have intellectual disabilities that
18    come and clean the courthouse; and with his felony conviction
19    he can't be in a courthouse, but my point is they have services
20    for persons like him to help him learn life skills and to learn
21    the social things that Dr. Rapa mentioned.  Those are available
22    to him in the community, and our hope is, with those protective
23    factors, that the Court won't see him again.  There is hope for
24    him, the Court can take a chance on him that he is different.
25    He is different than the average defendant before the Court
```

```
1    with a normal IQ of a normal age.  His young age, his IQ, his

2    trauma differentiate him, and those are all valid reasons that

3    we would ask the Court to downward vary.

4              THE COURT:  All right.  Thank you.

5              Mr. Zamot, if you wish to address the Court, you can,

6    but you are not required to.

7              THE DEFENDANT:  Yes, ma'am.  I just wanted to say

8    that I'm sorry for my actions.

9              THE COURT:  All right.  Thank you, sir.

10             Anything else?

11             THE DEFENDANT:  No, ma'am.

12             THE COURT:  All right.

13             Anything further from the Defense before the Court

14   imposes sentence?

15             MS. MILITELLO:  No, Your Honor.

16             THE COURT:  All right.

17             All right.  So having departed for substantial

18   assistance on Count II alone, the question now is whether to

19   vary downward on Count 1.  Having considered the parties'

20   presentations including the written filings and the

21   psychological evaluation along with Dr. Rapa's testimony today,

22   I do believe there is a basis to vary downward on Count 1 and

23   will do so.

24             That said, I think there is no mistaking, sir, that

25   you were and decided to knowingly participate in armed
```

```
 1    carjacking knowing full well that your codefendant was going to

 2    carry a firearm, then you fled on foot.  You did all of this

 3    wearing a mask and a hooded jacket.  The proffer references you

 4    standing directly behind Mr. Spivey as you were both

 5    approaching the vehicle.  I think it's clear that your actions

 6    instilled great fear and trauma in the victim, who has

 7    testified today, I think very candidly explained the impact on

 8    her life that your actions have had.

 9              That said, I have considered the cognitive

10    limitations that have been presented and so for those reasons,

11    given those limitations and the relative culpability, I'm going

12    to vary downward on Count I to 20 months from the bottom of the

13    guideline range which is 30; and the net result is a total

14    sentence of 70 months.

15              So the Court has considered the statements of all

16    parties, the presentence report which contains the advisory

17    guidelines and the statutory factors set forth in Title 18,

18    United States Code, Section 3553(a).

19              It is the finding of the Court that the defendant is

20    not able to pay a fine.

21              It is the judgment of the Court that the defendant,

22    Daniel Zamot, is committed to the Bureau of Prisons to be

23    imprisoned for a total of 70 months.  This sentence consists of

24    20 months as to Count I and 50 months as to Count II to be

25    served consecutively to Count 1.  I will reiterate that.  I
```

1   have exercised my authority under 3553(e) to go below the

2   mandatory minimum on Count II.

3           It is further ordered that the defendant shall pay

4   joint and several restitution with the defendant Artavis Spivey

5   in the amount of $3,500.  During the period of incarceration,

6   payment shall be made as follows:  One, if the defendant earns

7   wages in a Federal Prison Industries job, then the defendant

8   must pay 50 percent of wages earned toward the financial

9   obligations imposed by this judgment; two, if the defendant

10  does not work in a UNICOR job, then the defendant must pay a

11  minimum of $25 per quarter toward the financial obligations

12  imposed in this order.

13          Upon release from incarceration, the defendant shall

14  pay restitution at the rate of ten percent of monthly gross

15  earnings until such time as the Court may alter that payment

16  schedule in the interests of justice.

17          The U.S. Bureau of Prisons, U.S. Probation Office,

18  and U.S. Attorney's Office shall monitor the payment of

19  restitution and report to the Court any material change in the

20  defendant's ability to pay.

21          These payments don't preclude the government or

22  probation from using any other anticipated or unexpected

23  financial gains, assets, or income of the defendant to satisfy

24  the restitution obligations, and those restitution payments

25  should be forwarded to the clerk's office at the North Miami

1    Avenue address in Miami.

2          Upon release from imprisonment, the defendant shall

3    be placed on supervised release for a term of three years.

4    This term consists of three years as to each of Counts I and II

5    to be served concurrently.  Within 72 hours of release, the

6    defendant shall report in person to the probation office in the

7    district where released.  While on supervised release, the

8    defendant shall comply with the mandatory and standard

9    conditions of supervised release which include not committing

10   any crimes, being prohibited from possessing a firearm or other

11   dangerous device, not unlawfully committing any crimes --

12   excuse me, not unlawfully possessing a controlled substance and

13   cooperating in the collection of DNA.

14         The defendant also shall comply with the following

15   special conditions which are listed in Part F of the PSI, and

16   they include:  Association restriction, mental health

17   treatment, substance abuse treatment, employment requirement,

18   permissible search, financial disclosure requirement, and

19   unpaid restitution, fines, or special assessments.

20         It is further ordered that the defendant shall pay

21   immediately to the United States a special assessment of $100

22   as to each count for a total of $200.

23         The total sentence is, therefore, 70 months

24   imprisonment, three years supervised release, $3,500 in

25   restitution, and a $200 special assessments.

```
 1              Now that sentence has been imposed, does the
 2   defendant or his counsel object to the Court's finding of fact
 3   or to the manner in which sentence was pronounced?
 4              MS. MILITELLO:  No, Your Honor, but I do have
 5   recommendations I would request of the Court.
 6              THE COURT:  Sir, you have the right to appeal the
 7   sentence imposed.  Any notice of appeal must be filed within 14
 8   days after the entry of the judgment.  If you are unable to pay
 9   the cost of an appeal, you may apply for leave to appeal in
10   forma pauperis.
11              What are your recommendations?
12              MS. MILITELLO:  The first is that we would request
13   the Bureau of Prisons provide education for Mr. Zamot for
14   persons with intellectual disability, that is a program that
15   exists, not at all programs -- at all prisons, but my hope is
16   if the Court makes that recommendation, that they will house
17   him somewhere that does have that.
18              Secondly, we are requesting that they house him
19   somewhere with occupational training for welding or
20   construction, which was in the PSI.
21              Third, that they house him somewhere where he can
22   receive trauma therapy; and fourth, that it's at a facility
23   separate from that of his codefendant.
24              THE COURT:  All right.
25              MS. MILITELLO:  And I neglected and the government
```

```
 1    reminded, but we did agree that in the event Highlands County
 2    proceeds with the case, the underlying case that's the same
 3    case before the court, that Your Honor pronounce sentence
 4    concurrent with Highlands County case 2022-CF-000195.
 5              THE COURT:  All right.  The sentence just imposed
 6    shall run concurrent to any sentence imposed in State of
 7    Florida versus Daniel Zamot, case number 28-2022-CF-000195 out
 8    of Highlands County.
 9              Certainly, I think the separation order is essential
10    in this case, so that will be made part of the record.
11              With respect to the particularized request based on
12    education and occupation, I think I'm going to leave those
13    matters to BOP, and I think with the help of a fulsome PSI, BOP
14    is equipped to place Mr. Zamot in a facility that suits his
15    needs.
16              Do you have any recommendations, Ms. Militello?
17              MS. MILITELLO:  I believe just close to the Southern
18    District of Florida as well.
19              THE COURT:  All right.  I'll grant that final request
20    with respect to the location to facilitate family visitation.
21              Anything else from probation?
22              PROBATION OFFICER:  No, Your Honor.  Thank you.
23              THE COURT:  All right.  Anything else from the
24    government?
25              MR. PORTER:  No, Your Honor.
```

```
 1            THE COURT:  All right.

 2            Mr. Zamot, you have a long life ahead of you, you

 3     have a family that clearly supports you, I hope you will lean

 4     on them.  And I wish you all the best.  God bless you, sir.

 5            THE DEFENDANT:  Thank you.

 6         (PROCEEDINGS ADJOURNED AT 1:19 P.M.)

 7                   C-E-R-T-I-F-I-C-A-T-E

 8            I hereby certify that the foregoing is

 9         an accurate transcription and proceedings in the

10         above-entitled matter.

11
       1/12/2023                    /s/DIANE MILLER
12      DATE                   DIANE MILLER, RMR, CRR, CRC
                               Official Court Reporter
13                             United States District Court
                               101 South U.S. Highway 1
14                             Fort Pierce, FL  34950
                               772-467-2337
15

16

17

18

19

20

21

22

23

24

25
```

Thursday, November 17, 2022.

**BY MR. PORTER:**
**[1]** 32/24
**BY MS.**
**MILITELLO: [4]**
11/23 12/9 14/18
15/8
**MR. PORTER:**
**[18]** 2/6 2/22 3/16
3/25 5/22 6/11
6/19 10/15 10/23
11/1 12/6 14/25
34/21 41/24 42/25
46/17 50/5 58/25
**MS. MILITELLO:**
**[31]** 2/9 4/5 4/9
5/17 5/20 6/9 11/7
11/19 11/21 12/3
14/14 14/22 15/7
32/21 34/24 35/4
35/12 36/6 38/17
38/19 39/6 39/9
47/21 49/21 50/16
51/7 53/15 57/4
57/12 57/25 58/17
**PROBATION**
**OFFICER: [3]**
2/14 5/5 58/22
**THE COURT: [54]**
2/8 2/11 2/16
2/23 3/22 4/1 4/6
5/1 5/10 5/18 5/21
5/23 6/10 6/12
10/12 10/18 10/25
11/3 11/10 11/20
12/5 12/7 14/24
15/1 32/22 34/23
34/25 35/9 35/14
35/24 36/2 36/4
36/9 38/16 39/2
39/8 41/20 42/1
46/14 47/16 47/18
49/19 50/15 51/6
53/4 53/9 53/12
53/16 57/6 57/24
58/5 58/19 58/23
59/1
**THE**
**COURTROOM**
**DEPUTY: [3]** 2/2
11/13 11/15
**THE**
**DEFENDANT: [6]**

38/7 42/6 46/21 47/17
53/7 53/11 59/5
**THE VICTIM: [2]**
46/18 46/22
**THE WITNESS:**
**[11]** 11/18 35/2
35/11 35/16 36/1
36/3 36/5 36/8
36/12 38/3 38/18

**$**
**$100 [1]** 56/21
**$200 [3]** 6/7 56/22
56/25
**$200,000 [1]** 6/4
**$25 [1]** 55/11
**$3,500 [3]** 6/6
55/5 56/24

**/**
**/s/DIANE [1]**
59/11

**0**
**000195 [2]** 58/4
58/7

**1**
**1/12/2023 [1]**
59/11
**100 percent [1]**
13/19
**101 [2]** 1/15 59/13
**109 [1]** 1/19
**114 [2]** 7/18 10/16
**13 [1]** 26/11
**14 [1]** 57/7
**15 [1]** 10/13
**17 [1]** 1/4
**18 [7]** 3/1 3/3 3/4
6/21 43/9 47/25
54/17
**18-year-old [1]**
36/17 36/20
**18-years-old [1]**
20/1
**19 [1]** 5/25
**1990 [1]** 12/13
**1992 [1]** 12/14
**1999 [1]** 12/15
**1:19 [1]** 59/6
**1:30 [1]** 22/7

**2**
**20 [2]** 54/12 54/24
**20,000 [1]** 6/4
**2000 [2]** 12/22
12/23
**2022 [1]** 1/4
**2022-CF-000195**
**[1]** 58/4
**2023 [1]** 59/11
**2119 [1]** 3/1
**22-CRIMINAL-140**
**26-CANNON [2]**
1/2 2/3
**2337 [2]** 1/24
59/14
**25 [1]** 26/12
**28-2022-CF-00019**
**5 [1]** 58/7
**2nd [1]** 1/19

**3**
**30 [2]** 6/1 54/13
**30 percent [4]**
7/19 10/17 41/14
41/23
**3100 [1]** 1/15
**34 [3]** 7/12 7/19
7/22
**34950 [3]** 1/16
1/19 59/14
**3535 [1]** 9/18
**3553 [8]** 3/24 6/22
7/21 10/6 42/18
44/22 54/18 55/1
**37 [1]** 6/1

**4**
**467-2337 [1]** 1/24

**5**
**5,000 [1]** 13/3
**50 [2]** 7/12 54/24
**50 percent [3]**
41/16 41/19 55/8
**50-month [1]**
42/20
**5K [11]** 3/17 3/19
6/20 7/21 10/6
10/8 10/11 11/9
39/9 40/19 41/4
**5K1.1 [2]** 42/3
42/16
**5Ks [1]** 9/18

**7**
**70 [4]** 1/7 54/14
54/23 56/23
**72 [1]** 56/5
**76 [1]** 17/12
**77 [3]** 17/9 17/13
17/24
**772 [1]** 1/24
**772-467-2337 [1]**
59/14

**8**
**80 [1]** 28/9
**81 [3]** 14/16 14/23
15/1
**84 [2]** 6/2 42/20
**84-month [2]** 7/6
7/11
**89-1 [1]** 12/4

**9**
**924 [2]** 3/4 7/5

**A**
**abilities [2]** 17/25
18/21
**ability [4]** 18/6
18/6 43/20 55/20
**above [4]** 17/5
24/23 41/18 59/10
**above-entitled [1]**
59/10
**absolutely [1]**
27/23
**abstract [1]** 30/11
**abuse [1]** 56/17
**abutting [1]** 24/4
**Academy [1]**
29/10
**accept [1]** 20/16
**accepted [1]**
19/25
**accepting [1]**
49/7
**accommodate [1]**
28/5
**accommodations**
**[2]** 28/18 28/21
**accountable [5]**
45/13 45/19 46/23
46/25 47/3
**accounts [1]** 48/5
**acknowledge [4]**

43/9 43/16 44/2
44/13
**acted [1]** 48/22
**acting [1]** 21/13
**action [1]** 30/21
**actions [7]** 30/21
44/18 44/20 45/22
53/8 54/5 54/8
**activity [1]** 21/24
**acts [1]** 34/20
**add [2]** 5/21 6/10
**added [2]** 16/17
16/20
**addendum [1]**
4/16
**additions [1]** 5/7
**address [4]** 11/2
35/8 53/5 56/1
**ADHD [5]** 20/18
21/15 23/23 24/3
24/5
**ADJOURNED [1]**
59/6
**adjudicated [1]**
2/24
**admitted [3]** 12/7
15/2 49/9
**adolescents [2]**
13/4 13/9
**adopt [4]** 6/13
11/25 14/19 47/23
**adults [1]** 13/4
**adverse [2]** 24/8
25/3
**advisory [4]** 6/1
45/2 46/12 54/16
**AFPD [1]** 1/18
**afternoon [11]**
2/6 2/8 2/9 2/11
2/11 2/14 2/16
32/25 35/10 35/11
36/9
**age [7]** 18/13
20/17 20/22 26/7
48/15 53/1 53/1
**ages [1]** 26/11
**aggravating [2]**
43/8 44/24
**aggravator [1]**
51/12
**agreement [3]**
2/20 9/20 15/20
**ahold [1]** 23/10

## A

**AILEEN [1]** 1/10
**Albizu [2]** 12/14 12/15
**alcohol [1]** 27/11
**allow [1]** 38/22
**almost [1]** 14/7
**alone [1]** 53/18
**alter [1]** 55/15
**although [1]** 6/5
**amend [2]** 3/17 3/19
**amending [1]** 6/20
**AMERICA [1]** 1/3
**amount [3]** 6/5 40/17 55/5
**amounts [2]** 7/16 39/19
**amputated [1]** 22/11
**analysis [1]** 43/5
**answer [1]** 22/7
**anti [1]** 25/18
**anti-risk [1]** 25/18
**anticipate [1]** 9/11
**anticipated [1]** 55/22
**anticipating [1]** 6/14
**anticipation [2]** 3/6 3/14
**antisocial [4]** 26/23 27/2 27/3 31/10
**anxiety [5]** 16/13 24/14 24/17 25/6 25/8
**anxious [1]** 24/20
**apartment [2]** 49/4 50/22
**apparent [1]** 48/4
**appeal [4]** 57/6 57/7 57/9 57/9
**appearance [2]** 2/4 8/4
**APPEARANCES [1]** 1/13
**applicable [2]** 5/24 6/12
**application [1]**

## B

**baby [3]** 36/17 37/10 38/12
**Bachelor's [1]** 12/12
**background [4]** 8/2 12/11 23/13 24/13
**barely [1]** 48/21
**bargain [1]** 9/23
**barge [1]** 22/9
**basis [2]** 42/21 53/22
**basketball [2]** 37/18 48/6
**battle [1]** 47/11
**Beach [2]** 12/12 52/16
**behavior [8]** 19/12 21/18 27/4 28/9 28/24 28/25 32/15 48/3
**behavioral [2]** 20/25 21/17
**behind [2]** 44/18 54/4
**below [2]** 42/19 55/1
**bench [1]** 31/23
**beneficial [1]** 8/11
**benefit [3]** 27/12 29/16 43/24
**benefits [2]** 20/11 20/12
**bipolar [7]** 16/16 16/19 16/20 20/18 24/4 24/13 28/1
**Blake [1]** 16/1

(continued top of next columns)

**20/16
applied [1]** 20/16
**apply [2]** 7/17 57/9
**applying [1]** 20/11
**appreciate [2]** 33/10 35/24
**approaching [2]** 36/7 54/5
**Archways [2]** 29/10 52/15
**area [1]** 18/20
**aren't [1]** 26/20
**argument [4]** 11/6 11/9 39/4 45/23
**arguments [1]** 47/22
**armed [6]** 43/14 44/10 45/16 45/17 48/8 53/25
**Artavis [13]** 6/6 8/16 8/18 8/20 8/23 9/3 9/7 44/4 44/6 44/15 45/5 45/16 55/4
**ashamed [1]** 30/22
**aspects [1]** 13/2
**assault [2]** 9/17 39/23
**assertive [1]** 29/4
**assertiveness [2]** 29/2 29/3
**assessment [3]** 6/7 25/20 56/21
**assessments [4]** 25/11 25/11 56/19 56/25
**assets [1]** 55/23
**assistance [9]** 3/11 7/8 7/10 7/22 7/24 10/7 42/4 42/21 53/18
**assisted [1]** 42/5
**Association [1]** 56/16
**Atlantic [2]** 12/13 12/17
**attempted [1]** 45/6
**attorney [2]** 1/14

**3/8
Attorney's [1]** 55/18
**AUSA [1]** 1/14
**authority [2]** 42/18 55/1
**autism [1]** 20/24
**Avenue [1]** 56/1
**average [2]** 17/7 52/25
**Avon [1]** 15/23
**awkward [1]** 49/22

**bless [1]** 59/4
**bodes [1]** 43/18
**body [2]** 24/20 48/22
**bond [1]** 47/10
**BOP [6]** 4/18 40/25 43/23 52/11 58/13 58/13
**borderline [11]** 16/11 16/25 17/2 17/5 18/2 19/10 23/21 29/11 33/19 34/2 48/11
**bottom [5]** 7/18 10/15 45/2 46/12 54/12
**brandished [2]** 30/5 51/9
**brandishes [1]** 51/23
**brandishing [1]** 3/2
**breadth [1]** 52/7
**brief [1]** 47/21
**Bro [2]** 37/13 37/22
**broadening [1]** 5/10
**brother [1]** 36/18
**brothers [2]** 35/6 38/23
**Broward [2]** 29/10 52/15
**bullied [3]** 31/17 32/5 32/6
**bullying [1]** 32/5
**Bureau [3]** 54/22 55/17 57/13
**burglary [2]** 49/19 50/19

## C

**C-E-R-T-I-F-I-C-A-T-E [1]** 59/7
**calculated [2]** 6/12 10/13
**calculations [3]** 5/19 5/24 6/15
**callus [1]** 45/8
**Camacho [3]** 35/7 35/9 36/1
**candidly [1]** 54/7
**cannabis [3]**

**16/14 17/15 24/25
CANNON [3]** 1/2 1/10 2/3
**capacity [1]** 14/8 33/10
**car [10]** 30/3 30/3 30/4 30/5 30/8 44/16 44/18 45/6 45/7 45/11
**cards [1]** 29/5
**career [1]** 13/25
**carjacking [10]** 2/25 8/10 40/4 44/5 44/7 44/10 45/17 45/17 48/8 54/1
**carries [2]** 6/23 7/6
**carry [1]** 54/2
**Cassandra [1]** 36/6
**categories [2]** 5/12 15/10
**category [1]** 5/25
**caught [1]** 20/7
**CBT [1]** 28/8
**cellphone [1]** 21/23
**center [3]** 12/25 15/23 16/1
**certify [1]** 59/8
**CF [2]** 58/4 58/7
**chance [3]** 32/9 52/2 52/24
**characteristics [1]** 26/23
**charge [1]** 26/9
**charges [2]** 2/25 3/2
**chief [1]** 12/24
**child [2]** 20/23 32/3
**children [2]** 20/10 21/12
**Children's [1]** 12/16
**choose [1]** 43/14
**chose [2]** 43/12 48/20
**chronologically [1]** 18/19
**Chrysalis [8]** 12/24 13/2 13/16

## C

**Chrysalis... [5]** 13/18 26/6 26/8 26/8 26/11
**circumstance [1]** 10/1
**circumstances [2]** 42/9 45/4
**civil [2]** 14/8 25/17
**clarify [1]** 13/10
**classes [1]** 17/11
**classroom [3]** 21/15 31/21 31/22
**clean [2]** 42/12 52/18
**clear [6]** 9/8 15/5 18/25 23/1 49/14 54/5
**clerk's [1]** 55/25
**clients [1]** 14/4
**clinical [3]** 12/24 13/2 13/17
**clinically [1]** 26/15
**close [5]** 23/14 27/6 27/7 50/1 58/17
**closed [1]** 23/15
**closely [1]** 13/7
**closer [1]** 41/16
**Code [5]** 3/1 3/4 3/5 6/22 54/18
**codefendant [10]** 8/7 8/16 22/19 40/6 40/21 42/7 44/3 48/5 54/1 57/23
**coerced [1]** 8/22
**Coercion [1]** 49/7
**cognitive [7]** 18/3 18/21 19/13 20/1 20/3 28/8 54/9
**coin [1]** 43/12
**coincidence [1]** 31/15
**coins [1]** 50/2
**collection [1]** 56/13
**color [1]** 49/13
**commitment [1]** 14/9 25/17
**committed [1]** 54/22
**committing [2]** 56/9 56/11
**community [3]** 12/25 28/6 52/22
**complete [1]** 50/18
**completed [2]** 21/10 21/11
**complex [1]** 19/5
**comply [2]** 56/8 56/14
**concerns [2]** 5/4 39/19
**concrete [1]** 28/22
**concurrent [2]** 58/4 58/6
**concurrently [1]** 56/5
**condition [1]** 33/21
**conditions [2]** 56/9 56/15
**conduct [6]** 21/14 33/12 43/13 45/16 45/21 46/5
**conducted [2]** 25/11 40/19
**conflicts [1]** 4/10
**confused [1]** 36/1
**consecutive [1]** 6/2
**consecutively [1]** 54/25
**consequences [7]** 18/11 19/7 44/20 45/17 45/21 47/4 47/5
**consequential [2]** 18/6 34/4
**consideration [1]** 41/6
**consistent [2]** 17/20 40/2
**consists [2]** 54/23 56/4
**construction [1]** 57/20
**contained [1]** 3/21

**contains [1]** 54/16
**continued [1]** 40/24
**contract [1]** 52/15
**controlled [1]** 56/12
**conveyed [1]** 39/22
**conviction [2]** 43/11 52/18
**cool [1]** 19/17
**cooperate [2]** 8/5 8/14
**cooperates [1]** 39/15
**cooperating [2]** 8/17 56/13
**cooperation [8]** 7/9 8/2 8/25 9/1 9/20 40/5 40/7 40/18
**cooperators [2]** 9/17 9/20
**core [1]** 9/19
**corner [1]** 34/12
**correctional [1]** 31/9
**corresponding [1]** 13/6
**count [31]** 2/20 2/21 2/25 3/1 6/1 6/3 6/23 7/5 7/5 7/12 7/14 7/15 7/21 10/13 41/13 41/13 41/14 42/17 42/19 42/24 45/1 46/13 53/18 53/19 53/22 54/12 54/24 54/24 54/25 55/2 56/22
**Counts [2]** 2/19 56/4
**county [8]** 9/10 9/16 9/25 13/20 52/16 58/1 58/4 58/8
**court [78]**
**Court's [2]** 41/18 57/2
**court-related [1]** 13/22
**courthouse [2]**

52/18 52/19
**covered [2]** 28/23 32/20
**crashed [1]** 45/8
**CRC [1]** 59/12
**creates [1]** 39/13
**credibility [1]** 41/22
**crime [5]** 3/3 8/13 27/21 44/14 46/10
**crimes [4]** 46/2 46/2 56/10 56/11
**criminal [17]** 1/2 2/3 5/25 13/24 21/2 21/5 21/23 32/15 32/16 35/21 43/10 43/11 43/13 43/15 43/17 48/1 51/13
**criteria [1]** 26/13
**CROSS [1]** 32/23
**CROSS-EXAMINA TION [1]** 32/23
**CRR [2]** 1/23 59/12
**crying [2]** 35/6 35/7
**cues [1]** 19/6
**culpability [1]** 54/11
**curriculum [2]** 11/24 12/1
**curse [1]** 37/16
**custody [1]** 40/22
**cut [2]** 38/4 50/3
**cuts [1]** 43/16
**CV [2]** 12/7 12/10

## D

**daily [1]** 18/8
**danger [2]** 14/9 18/10
**dangerous [1]** 56/11
**dangerousness [1]** 25/11
**DANIEL [47]** 1/6 2/3 2/10 7/7 7/23 8/7 8/21 8/22 8/25 9/2 9/10 9/13 9/22 10/6 15/16 17/8 21/25 22/10 23/3 23/8 29/22 29/25

30/24 31/13 31/16 31/22 32/1 32/19 35/4 38/24 39/23 40/11 44/6 44/8 45/5 45/10 45/16 45/24 47/25 48/17 48/21 49/3 51/2 51/10 51/10 54/22 58/7
**Daniel's [1]** 41/4
**dealt [1]** 36/14
**death [1]** 38/1
**debrief [1]** 49/23
**debriefs [1]** 48/9
**decades [1]** 26/16
**decided [1]** 53/25
**decision [7]** 22/23 23/1 23/4 49/11 49/16 50/12 51/3
**decision-making [3]** 22/23 23/1 23/4
**decisions [1]** 18/7
**decrease [1]** 25/24
**deep [1]** 43/12
**defendant [24]** 1/7 1/18 6/6 7/7 42/5 48/1 49/20 52/25 54/19 54/21 55/3 55/4 55/6 55/7 55/9 55/10 55/13 55/23 56/2 56/6 56/8 56/14 56/20 57/2
**defendant's [1]** 55/20
**defendants [1]** 41/2
**Defender [1]** 1/18
**defense [7]** 5/6 11/14 13/23 14/1 49/7 49/8 53/13
**deficit [1]** 16/12
**delivery [1]** 22/6
**depart [5]** 7/10 7/21 41/10 41/13 41/13
**departed [1]** 53/17

## D

**Department [1]** 13/11
**departure [8]** 7/12 10/4 10/6 10/17 41/22 41/25 42/3 42/8
**deprivation [1]** 46/6
**deserve [1]** 37/14
**desire [1]** 49/18
**deter [1]** 27/1
**deterrence [2]** 45/24 46/3
**detours [1]** 42/13
**deviant [2]** 19/12 50/25
**device [1]** 56/11
**diagnosed [8]** 16/11 16/16 20/17 20/18 20/19 24/25 33/18 34/2
**diagnoses [9]** 4/14 16/7 16/8 16/22 16/24 23/20 24/16 31/1 33/16
**diagnosis [9]** 4/21 13/1 16/18 16/20 22/4 23/24 24/3 24/24 52/6
**diane [4]** 1/23 1/25 59/11 59/12
**difference [1]** 51/22
**differentiate [2]** 51/18 53/2
**difficult [3]** 16/19 36/11 42/25
**difficulties [2]** 18/3 52/13
**difficulty [1]** 48/7
**digital [1]** 49/13
**direct [2]** 9/1 11/22
**directed [1]** 5/1
**direction [1]** 42/18
**disabilities [1]** 52/17
**disability [11]** 4/21 17/4 17/6 19/10 20/4 20/22

21/6 29/11 29/11 48/11 57/14
**disagreement [2]** 7/1 44/23
**disclose [1]** 50/13
**disclosed [2]** 50/8 50/11
**disclosure [1]** 56/18
**discovery [1]** 19/19
**discretion [1]** 41/18
**discussion [1]** 42/23
**dismiss [1]** 2/20
**disorder [8]** 16/12 16/13 16/13 16/14 16/17 22/14 23/21 24/13 24/17 24/25 25/7 26/23 27/2 27/20 28/1
**disparity [1]** 39/14
**disregard [1]** 45/8
**distinguish [2]** 51/8 51/11
**district [7]** 1/1 1/1 1/11 39/11 56/7 58/18 59/13
**district's [1]** 17/21
**dive [1]** 43/12
**divided [1]** 15/10
**DJJ [3]** 13/7 13/10 21/21
**DNA [2]** 8/9 56/13
**docket [5]** 12/3 14/16 14/22 15/1 41/2
**doctorate [1]** 12/14
**document [1]** 20/13
**Domino's [1]** 22/6
**dormitory [1]** 9/5
**Dorothy [1]** 15/22
**double [2]** 40/13 40/15
**double-edged [2]** 40/13 40/15

**downward [12]** 3/10 7/11 41/25 42/2 42/23 45/1 47/20 47/23 53/3 53/19 53/22 54/12
**dozen [1]** 40/8
**Dr [6]** 11/11 14/19 15/2 15/25 34/21 52/3
**Dr. [11]** 4/14 11/8 11/24 15/9 32/25 34/24 43/21 48/2 52/13 52/21 53/21
**Dr. Rapa [8]** 11/24 15/9 32/25 34/24 43/21 48/2 52/13 52/21
**Dr. Rapa's [1]** 53/21
**Dr. Sheila [2]** 4/14 11/8
**drove [1]** 45/7
**DSM [1]** 19/9
**DSM-5 [1]** 19/9
**dual [1]** 13/1

## E

**early [1]** 20/11
**earned [2]** 10/8 55/8
**earnings [1]** 55/15
**earns [1]** 55/6
**easily [4]** 19/15 19/15 19/24 31/14
**edged [2]** 40/13 40/15
**education [3]** 48/14 57/13 58/12
**educational [6]** 4/13 5/7 12/11 15/15 15/21 15/22
**effective [3]** 7/17 7/18 10/16
**effects [3]** 24/8 25/3 25/4
**effort [1]** 36/23
**eight [5]** 16/16 20/11 20/17 20/17 48/13
**eight-years-old [2]** 20/11 48/13
**eighth [1]** 21/10

**element [2]** 23/16 23/17
**elementary [2]** 31/18 31/20
**elements [1]** 19/22
**emotional [1]** 22/16
**empathy [1]** 30/16
**employment [2]** 5/8 56/17
**encouraging [1]** 42/12
**engage [3]** 44/10 45/20 46/5
**engaged [2]** 45/9 46/11
**enhancements [1]** 51/15
**enormous [1]** 45/18
**entitled [1]** 59/10
**entry [4]** 12/4 14/16 14/23 57/8
**equates [1]** 7/12
**equipped [1]** 58/14
**equivalent [1]** 18/13
**escalating [1]** 48/3
**especially [3]** 17/16 19/15 43/23
**essential [1]** 58/9
**Essentially [1]** 8/3
**evaluated [1]** 33/4
**evaluating [1]** 8/24
**evaluation [7]** 3/7 14/11 15/9 24/10 33/9 33/24 53/21
**evaluations [3]** 13/13 13/22 14/6
**event [1]** 58/1
**everybody [1]** 37/16
**evidence [11]** 8/9 8/9 8/9 11/5 12/4 14/23 27/2 27/24 28/4 40/21 40/21

**evidence-based [2]** 27/24 28/4
**evidenced [1]** 28/3
**evidenced-based [1]** 28/3
**exacerbation [1]** 21/19
**exaggerate [1]** 39/23
**exaggerated [1]** 40/2
**EXAMINATION [2]** 11/22 32/23
**Exceptional [1]** 15/23
**exchange [1]** 2/19
**exclusively [1]** 14/7
**excuse [4]** 36/18 39/23 48/24 56/12
**excused [1]** 35/3
**executive [1]** 18/4
**exercised [2]** 42/17 55/1
**exists [1]** 57/15
**exonerating [1]** 8/23
**experience [3]** 13/13 25/10 26/18
**experiences [1]** 24/22
**expert [2]** 13/21 13/23
**express [1]** 30/9
**extensive [1]** 15/21
**extent [4]** 8/25 41/22 42/8 44/25
**extremely [2]** 19/14 20/23
**eye [1]** 20/7

## F

**faced [1]** 34/7
**facilitate [1]** 58/20
**facilities [1]** 13/1
**facility [3]** 12/19 57/22 58/14
**fact [7]** 7/7 8/18 10/9 51/9 51/18

## F

**fact...** [2]  52/2
57/2
**factor** [2]  27/9
43/15
**factored** [1]  42/14
**factors** [10]  8/24
26/21 43/5 43/8
44/22 44/24 44/25
46/9 52/23 54/17
**facts** [1]  44/23
**failed** [3]  37/15
37/16 37/17
**fall** [1]  18/19
**falls** [1]  18/20
**false** [1]  8/22
**family** [17]  8/22
9/1 27/5 35/5 38/8
38/8 40/23 41/8
47/9 47/10 49/5
49/18 50/24 51/5
52/2 58/20 59/3
**fast** [1]  28/20
**fault** [2]  9/3 10/1
**FBI** [1]  40/3
**fear** [7]  23/1
23/19 40/16 48/22
48/25 49/17 54/6
**federal** [5]  13/10
13/14 48/1 49/9
55/7
**feelings** [1]  37/23
**felony** [1]  52/18
**feud** [1]  48/19
**fifty** [2]  14/1 14/1
**fifty-fifty** [1]  14/1
**figure** [1]  48/2
**file** [1]  15/3
**filings** [2]  3/9
53/20
**final** [1]  58/19
**finally** [1]  6/7
**financial** [4]  55/8
55/11 55/23 56/18
**finger** [1]  22/11
**fingerprint** [1]  8/9
**firearm** [6]  3/2
44/16 51/10 51/23
54/2 56/10
**fits** [1]  26/13
**FL** [1]  59/14
**flashbacks** [1]
22/16
**flaunts** [1]  26/24
**fled** [1]  54/2
**flight** [1]  51/16
**Flores** [1]  38/21
**FLORIDA** [11]  1/1
1/6 1/16 1/19
12/22 13/20 14/6
25/16 39/12 58/7
58/18
**flow** [1]  47/2
**flsd.uscourts.gov**
[1]  1/25
**focus** [1]  29/15
**follower** [2]  47/1
51/11
**followers** [1]
19/17
**foot** [1]  54/2
**foray** [1]  43/14
**foregoing** [1]
59/8
**foremost** [1]  45/3
**forensic** [2]  13/17
13/19
**forgetting** [1]
19/11
**form** [1]  34/11
**forma** [1]  57/10
**FORT** [5]  1/6 1/16
1/19 39/12 59/14
**forwarded** [1]
55/25
**four-years-old** [1]
23/24
**fourth** [1]  57/22
**frankly** [2]  48/4
49/24
**friends** [2]  37/18
37/19
**fucking** [1]  37/16
**fulsome** [2]  6/14
58/13
**functioning** [11]
16/12 17/1 17/2
18/2 19/11 19/14
20/19 21/16 23/21
33/19 34/2
**functions** [1]  18/4

## G

**gains** [1]  55/23
**game** [1]  48/20
**games** [1]  48/6
**gang** [2]  40/21
40/22
**geared** [1]  28/25
**general** [2]  17/19
46/3
**generalized** [2]
16/13 24/17
**gets** [6]  10/13
32/13 34/13 43/22
43/23 45/25
**God** [1]  59/4
**gold** [1]  50/2
**gotten** [1]  39/25
**government** [12]
2/5 6/17 39/18
40/3 41/9 42/5
47/24 49/24 50/3
55/21 57/25 58/24
**government's** [5]
2/20 3/11 40/19
42/9 42/15
**grab** [1]  30/3
**grade** [3]  21/9
21/10 21/11
**grant** [5]  20/22
41/18 42/4 42/16
58/19
**grants** [1]  15/4
**gravity** [1]  43/13
46/10
**great** [3]  34/10
41/8 54/6
**greater** [5]  3/20
7/2 10/4 39/17
41/11
**greatest** [1]  52/2
**grew** [1]  13/18
**gross** [1]  55/14
**group** [5]  12/25
26/7 28/14 28/15
52/16
**grow** [1]  36/19
**guarantee** [1]
47/13
**guidance** [3]
28/17 34/18 47/8
**guideline** [10]
5/18 5/24 6/1 6/13
7/17 7/18 10/16
45/2 46/13 54/13
**guidelines** [6]
41/6 51/8 51/14
51/17 51/18 54/17
**guilt** [1]  39/20
**guilty** [2]  2/19
2/24 8/21 8/21
**gullible** [2]  19/14
31/12
**gun** [2]  22/19
45/10
**gunpoint** [1]  45/6
**guns** [3]  22/20
22/20 22/21

## H

**handgun** [1]  30/5
**handle** [3]  21/14
31/8 52/7
**hang** [2]  23/13
23/17
**hanging** [1]  51/2
**happy** [1]  5/10
**harm** [2]  37/5
51/23
**hate** [1]  30/12
**health** [11]  4/12
5/3 12/24 12/25
13/2 13/7 20/25
20/25 26/6 52/7
56/16
**hearing** [10]  1/10
2/17 3/7 3/15 4/4
4/25 8/15 9/14
10/22 15/5
**heart** [1]  37/13
**hereby** [2]  15/4
59/8
**Hi** [1]  33/1
**higher** [1]  28/9
**Highlands** [3]
58/1 58/4 58/8
**Highway** [1]  1/15
59/13
**hired** [3]  14/1
14/1 48/2
**hires** [1]  13/23
**histories** [1]
51/13
**history** [10]  5/25
21/2 21/6 23/23
25/10 31/17 35/21
43/10 43/17 48/1
**hit** [1]  22/10
**hold** [2]  46/23
46/24

**home** [8]  21/20
22/1 48/5 48/18
48/20 50/20 50/20
50/21
**homes** [1]  12/25
**honest** [1]  42/13
**Honor** [30]  2/6
2/9 2/14 3/25 4/5
5/5 5/17 5/22 6/9
6/11 6/19 7/10 8/1
8/15 10/23 11/1
11/7 12/3 12/6
14/14 14/25 36/6
38/17 43/1 46/17
53/15 57/4 58/3
58/22 58/25
**HONORABLE** [1]
1/10
**hooded** [1]  54/3
**hope** [7]  43/19
43/22 49/12 52/22
52/23 57/15 59/3
**hopefully** [4]  4/18
50/1 52/9 52/13
**horrendous** [1]
30/22
**Hospital** [2]  12/16
12/18
**hospitalized** [1]
22/12
**hours** [3]  24/19
33/7 56/5
**house** [6]  35/18
35/20 49/2 57/16
57/18 57/21
**housed** [1]  9/4
**huge** [1]  29/1
**human** [1]  45/9
**hundred** [2]  22/5
24/12
**hurricane** [1]
4/11
**hurt** [3]  37/12
37/23 37/25
**hurts** [2]  37/9
37/23
**hyperactivity** [1]
16/13

## I

**IEPs** [1]  48/13
**II** [18]  2/19 3/1 6/3
6/23 7/5 7/12 7/14

**I**

**II... [11]**  7/15 7/21
10/13 41/13 41/14
42/17 42/19 53/18
54/24 55/2 56/4
**III [1]**  2/21
**imagine [2]**  24/2
30/13
**immediately [2]**
22/10 56/21
**impact [3]**  22/23
45/18 54/7
**impactful [2]**  8/7
8/14
**imposed [6]**  55/9
55/12 57/1 57/7
58/5 58/6
**imposes [1]**
53/14
**imprisoned [1]**
54/23
**imprisonment [3]**
6/3 56/2 56/24
**impulsivity [1]**
18/5
**incarceration [2]**
55/5 55/13
**income [1]**  55/23
**inconsistencies
[1]**  42/10
**incorporates [1]**
5/2
**increase [3]**  3/17
17/18 25/24
**independent [1]**
19/25
**indictment [6]**
2/19 3/2 7/5 7/14
7/16 15/20
**individual [1]**
15/21
**individualized [1]**
48/14
**individuals [1]**
26/2
**Industries [1]**
55/7
**influence [1]**
50/25
**influenced [1]**
19/24
**information [7]**

4/17 5/11 6/15
15/24 18/21 50/1
50/6
**informed [1]**
41/23
**initial [2]**  8/4 40/4
**initially [1]**  51/4
**injuries [1]**  22/12
**inmates [1]**  41/3
**inpatient [1]**
12/16
**insanity [1]**  18/25
**insight [1]**  30/16
**instance [1]**  41/7
**instead [1]**  49/8
**instilled [1]**  54/6
**instruct [2]**  4/16
4/23
**insufficient [2]**
41/10 41/14
**intellectual [20]**
4/21 16/11 16/25
17/2 17/4 17/6
18/2 19/10 19/10
20/19 21/6 21/16
23/21 29/11 29/11
33/19 34/2 48/11
52/17 57/14
**intend [3]**  3/19
3/19 4/15
**interests [1]**
55/16
**internship [1]**
12/15
**interviewing [2]**
24/18 27/8
**intimidation [1]**
23/17
**invocation [1]**
3/23
**invoking [1]**  6/21
**IQ [20]**  17/3 17/3
17/6 17/8 17/9
17/12 17/14 17/18
17/19 17/24 18/12
18/18 28/5 28/10
28/12 34/1 34/1
48/10 53/1 53/1
**IQs [1]**  28/9
**issues [6]**  13/7
20/25 21/1 39/18
41/22 52/7

**J**

**jacket [1]**  54/3
**jail [6]**  9/10 9/16
9/25 29/5 31/5
34/14
**janitorial [1]**
52/17
**Jennifer [2]**  44/16
45/18
**job [3]**  37/4 55/7
55/10
**join [1]**  28/8
**joint [2]**  6/6 55/4
**JUDGE [11]**  1/11
3/16 6/19 9/13
32/19 34/22 41/25
42/25 44/15 46/8
50/5
**judgment [3]**
54/21 55/9 57/8
**jury [1]**  8/12
**justice [4]**  13/6
13/11 43/15 55/16
**justifiable [1]**
49/17
**juvenile [3]**  13/6
13/11 21/5
**juveniles [1]**  13/5

**K**

**Kastigar [2]**  50/5
50/8
**kid [3]**  35/20
35/22 48/18
**kids [6]**  21/13
21/17 35/16 35/19
36/25 48/15
**knowing [2]**  51/1
54/1
**knowingly [1]**
53/25
**knows [2]**  41/1
51/25
**KRISTI [2]**  1/18
2/9

**L**

**lack [2]**  19/17
43/17
**lady [1]**  38/11
**Lakeland [1]**
15/25
**large [2]**  9/25

25/13
**larger [1]**  10/10
**lashes [1]**  37/24
**lean [1]**  59/3
**learn [6]**  17/17
29/1 34/5 34/18
52/20 52/20
**learned [1]**  48/10
**learning [2]**  34/15
40/11
**led [1]**  19/15
**lessons [1]**  17/17
**letter [6]**  8/23
31/5 31/6 34/14
50/6 50/8
**liberty [1]**  46/6
**licensed [2]**
12/22 13/15
**life [14]**  17/17
18/1 18/3 21/5
28/16 36/16 40/15
43/25 45/9 46/20
47/14 52/20 54/8
59/2
**limit [1]**  42/17
**limitations [4]**
20/2 20/3 54/10
54/11
**literally [1]**  23/24
**local [1]**  52/16
**locally [1]**  29/9
**location [1]**  58/20
**locked [2]**  12/18
22/9
**love [3]**  28/15
30/19 38/1
**loves [1]**  31/25
**lower [2]**  17/7
28/5
**Lucie [3]**  9/9 9/16
9/25
**Luckily [1]**  32/1
**lung [1]**  22/10

**M**

**magnitude [1]**
46/3
**main [1]**  29/15
**majority [2]**  13/4
26/10
**majorly [1]**  20/24
**mandatory [7]**  6/2
6/23 7/6 7/11

42/19 55/2 56/8
**mandatory-minim
um [1]**  42/19
**manipulation [1]**
33/22
**manner [1]**  57/3
**marijuana [2]**
25/5 27/11
**mask [1]**  54/3
**Master's [1]**
12/13
**material [2]**  32/18
55/19
**materials [2]**  3/14
4/3
**matter [3]**  45/15
45/15 59/10
**matters [1]**  58/13
**mature [1]**  19/3
**medical [4]**  3/7
15/15 15/24 16/1
**medicated [1]**
24/15
**medication [7]**
24/2 24/6 24/8
24/11 25/9 27/25
32/13
**medications [3]**
23/25 24/7 25/2
**meeting [1]**  40/4
**meetings [2]**  40/5
42/11
**member [3]**  40/22
44/1 46/1
**members [1]**  35/5
**memorandum [1]**
49/12
**memory [1]**  30/1
**mental [8]**  4/12
5/2 12/25 13/6
20/24 20/25 52/7
56/16
**message [3]**
45/14 45/20 46/4
**Miami [3]**  12/16
55/25 56/1
**MICHAEL [2]**  1/14
2/6
**middle [2]**  31/18
31/20
**mild [2]**  25/7
27/11
**militates [1]**

# M

**militates... [1]** 10/10
**MILITELLO [17]** 1/18 2/10 4/3 4/8 5/3 5/14 5/19 6/8 6/25 7/2 11/4 33/3 33/15 39/3 44/23 47/19 58/16
**miller [4]** 1/23 1/25 59/11 59/12
**mimicking [1]** 21/18
**mine [1]** 35/17
**minimum [6]** 6/23 7/6 7/11 42/19 55/2 55/11
**mistaking [1]** 53/24
**mitigate [1]** 51/21
**mitigating [3]** 43/5 44/25 46/9
**modification [2]** 28/24 28/25
**mom [11]** 20/11 20/15 22/7 27/22 30/13 32/2 32/3 36/15 36/24 36/25 37/7
**moment [1]** 10/24
**monitor [2]** 52/5 55/18
**month [3]** 7/6 7/11 42/20
**monthly [1]** 55/14
**months [16]** 6/1 6/2 7/12 7/13 7/19 7/19 7/22 10/13 10/16 42/20 54/12 54/14 54/23 54/24 54/24 56/23
**mostly [1]** 26/7
**mother [11]** 22/2 23/7 23/7 27/6 27/7 31/25 36/25 38/21 39/20 40/7 49/2
**motion [15]** 3/12 3/17 3/19 3/21 6/20 7/15 14/15 15/3 19/9 40/19 41/24 42/2 42/4

**motions [1]** 9/19
**motivator [1]** 49/18
**Mr [1]** 50/12
**Mr. [80]**
**Mr. Porter [8]** 3/13 5/21 6/10 6/18 10/19 12/5 32/22 41/21
**Mr. Rodriguez [1]** 50/14
**Mr. Spivey [18]** 23/6 23/8 23/13 27/14 30/2 30/4 30/6 31/15 34/13 34/14 42/7 43/3 44/14 50/21 50/23 51/9 51/15 54/4
**Mr. Vreeland [3]** 2/16 5/4 5/13
**Mr. Zamot [41]** 2/12 2/18 4/18 8/1 8/3 8/17 15/11 15/19 16/3 16/11 18/19 19/2 19/23 24/6 25/20 26/13 27/1 27/16 29/3 29/16 31/1 32/8 33/4 33/9 33/18 33/24 39/20 42/19 43/2 43/9 43/19 43/24 45/19 46/11 49/25 50/9 50/16 53/5 57/13 58/14 59/2
**Mr. Zamot's [9]** 4/12 7/17 21/2 38/21 40/23 42/3 42/10 45/2 48/10
**Ms [20]** 4/3 4/8 5/3 5/14 5/19 6/8 6/25 7/2 10/23 11/4 33/3 33/15 35/9 36/9 38/20 39/3 44/23 45/10 47/19 58/16
**Ms. [1]** 11/1
**Ms. Shiflet [1]** 11/1
**multiple [3]** 5/12 15/22 17/10
**multitask [1]**

47/19 47/22
28/20
**Myriam [2]** 35/7 36/1

# N

**Nathan [1]** 2/15
**nature [2]** 7/24 45/4
**navigate [3]** 18/9 29/7 40/14
**navigating [1]** 19/5
**neglected [1]** 57/25
**neighborhood [1]** 48/18
**net [1]** 54/13
**nightmares [1]** 22/16
**ninth [1]** 21/11
**nobody [1]** 22/8
**none [3]** 5/20 6/15 27/23
**nonverbal [2]** 17/18 18/18
**North [2]** 1/19 55/25
**notice [1]** 57/7
**nowhere [1]** 36/24
**number [4]** 14/2 25/13 26/21 58/7
**numbing [1]** 22/16

# O

**O'Neil [2]** 36/6 36/9
**object [1]** 57/2
**objection [5]** 4/24 12/5 12/6 14/24 14/25
**objections [3]** 4/7 4/10 5/18
**obligation [1]** 50/13
**obligations [3]** 55/9 55/11 55/24
**obstruction [1]** 51/16
**occupation [1]** 58/12
**occupational [1]**

57/19
**offense [9]** 5/25 8/3 29/22 44/3 45/4 48/23 51/17 51/19 52/1
**offenses [1]** 2/25
**offer [1]** 39/3
**office [8]** 1/14 1/18 50/7 50/12 55/17 55/18 55/25 56/6
**officer [1]** 12/24
**Official [2]** 1/24 59/12
**Oftentimes [1]** 9/17
**Oh [1]** 28/24
**older [1]** 36/3
**oldest [2]** 35/7 36/13
**one's [1]** 17/14
**ongoing [1]** 40/24
**online [1]** 14/5
**open [1]** 5/8
**opinion [1]** 34/7
**opportunities [3]** 44/8 44/9 44/11
**opportunity [6]** 15/15 19/9 34/5 47/7 49/15 49/16
**options [2]** 15/12 52/16
**order [4]** 4/24 15/5 55/12 58/9
**outlook [1]** 18/1
**outpatient [3]** 12/17 12/25 29/20
**outweigh [1]** 44/25
**outweighed [1]** 46/10

# P

**P-R-O-C-E-E-D-I-N-G-S [1]** 2/1
**P.M [1]** 59/6
**pages [2]** 1/7 16/1
**pain [1]** 48/22
**Palm [2]** 12/12 52/16
**Panhandle [1]** 13/21

**panicking [1]** 40/7
**parcel [1]** 44/19
**parent [1]** 36/24
**Park [1]** 15/23
**part [9]** 5/9 13/17 25/10 25/15 44/14 44/19 49/24 56/15 58/10
**part-time [1]** 13/17
**participants [1]** 8/13
**participate [2]** 49/16 53/25
**participated [1]** 48/23
**participating [2]** 48/7 51/21
**particularized [1]** 58/11
**parties [1]** 54/16
**parties' [1]** 53/19
**passenger [1]** 30/8
**pattern [3]** 27/3 32/15 48/3
**pauperis [1]** 57/10
**pay [9]** 46/5 54/20 55/3 55/8 55/10 55/14 55/20 56/20 57/8
**payment [3]** 55/6 55/15 55/18
**payments [2]** 55/21 55/24
**peer [2]** 28/14 28/15
**peers [5]** 19/12 32/6 33/22 48/15 50/25
**pending [2]** 15/3 39/10
**people [12]** 8/10 13/3 20/1 26/7 26/10 26/25 28/8 29/10 31/10 31/13 37/5 43/14
**perceive [1]** 18/9
**percentage [5]** 7/2 7/16 10/10 10/12 41/9

**P**

percentage-wise [1] 7/16
perfectly [1] 5/10
Perhaps [1] 46/15
period [1] 55/5
permissible [1] 56/18
person [2] 51/22 56/6
personal [1] 41/8
personalities [1] 31/10
personality [2] 26/23 27/2
persons [3] 25/17 52/20 57/14
perspective [1] 26/3
Ph.D [1] 11/14
phone [13] 23/9 23/9 23/10 23/11 23/12 23/13 23/14 23/15 30/7 30/7 38/4 45/7 48/19
photos [1] 49/13
pick [2] 31/11 31/11
picked [3] 23/12 31/14 31/17
piece [3] 15/14 21/8 48/17
PIERCE [5] 1/6 1/16 1/19 39/13 59/14
pizza [2] 22/6 22/8
placate [1] 29/6
place [4] 4/18 32/13 40/11 58/14
Plaintiff [2] 1/4 1/14
plan [1] 15/22
planning [1] 18/5
plans [1] 48/14
play [1] 29/5
played [1] 45/12
playing [1] 37/18
plays [2] 48/6 48/6
plea [1] 15/20
pleading [1]

47/23
pled [3] 2/18 8/20 8/21
podium [1] 39/7
point [6] 3/18 9/15 13/25 30/6 31/19 52/19
points [3] 17/5 17/16 44/12
police [1] 21/22
pool [1] 43/13
population [2] 13/8 17/7
PORTER [10] 1/14 2/7 3/13 5/21 6/10 6/18 10/19 12/5 32/22 41/21
position [5] 9/2 37/21 38/10 38/11 49/22
possessing [2] 56/10 56/12
post [6] 4/16 5/2 15/5 22/13 23/20 27/20
post-hearing [1] 15/5
post-sentencing [1] 4/16
post-traumatic [3] 22/13 23/20 27/20
posttraumatic [1] 16/12
powerful [2] 19/16 23/18
practical [1] 26/18
practice [6] 13/15 13/16 13/18 14/3 17/1 50/6
practicing [1] 12/21
preclude [1] 55/21
predator [1] 14/5
predict [1] 26/19
predictable [1] 28/2
preparation [1] 33/4
prepared [2] 3/8 3/16

preschool [1] 20/13
present [9] 10/21 10/23 11/5 35/5 38/21 43/6 43/8 46/9 51/24
presentations [1] 53/20
presentence [1] 54/16
price [1] 46/5
primarily [1] 26/9
principles [1] 9/19
prison [6] 31/2 31/3 40/14 40/15 40/16 55/7
prisons [4] 54/22 55/17 57/13 57/15
private [3] 13/15 13/16 13/18
probation [13] 2/13 2/15 4/10 4/20 4/23 5/1 50/7 50/11 52/15 55/17 55/22 56/6 58/21
problem [1] 44/7
problems [2] 21/14 21/17
procedure [1] 7/1
proceed [3] 11/19 15/6 49/8
proceeded [2] 8/19 21/5
proceeding [1] 7/4
proceedings [2] 59/6 59/9
proceeds [1] 58/2
processes [1] 18/21
produces [1] 5/25
product [2] 10/1 33/21
productive [2] 44/1 46/1
professional [1] 12/11
proffer [3] 38/22 52/4 54/3
profound [2] 46/3 46/4
prognosis [2]

15/11 32/8
program [5] 13/5 13/8 13/9 29/19 57/14
programs [5] 13/1 13/1 29/17 29/19 57/15
prohibited [1] 56/10
project [1] 5/11
promised [1] 52/3
pronounce [1] 58/3
pronounced [1] 57/3
proof [1] 8/8
proper [6] 24/3 27/25 27/25 32/12 32/13 45/25
proposal [4] 6/18 41/23 42/9 42/15
protect [1] 32/7
protected [1] 38/9
protective [2] 27/9 52/22
provisional [2] 16/18 16/21
PSI [11] 4/7 4/8 4/17 5/2 5/15 6/13 6/14 15/20 56/15 57/20 58/13
psychiatric [1] 12/18
psychiatrist [1] 24/10
psychological [3] 14/11 15/15 53/21
psychologist [3] 12/23 30/17 30/19
psychotropic [2] 23/25 25/1
PTA [1] 32/4
PTSD [12] 4/21 16/19 16/20 22/4 22/23 23/4 24/14 24/23 25/8 27/24 48/17 52/6
public [3] 1/18 41/15 46/4
publicly [3] 40/20 40/20 41/7

pulled [2] 30/5 44/15
pulls [1] 29/4
pursuant [3] 7/20 50/5 50/7
puzzle [1] 21/9

**Q**

quarter [1] 55/11
question [5] 5/6 27/19 34/10 44/4 53/18
questions [1] 33/2
quickly [1] 39/24
quote [2] 19/9 19/12

**R**

R-A-P-A [1] 11/18
raise [3] 11/13 25/24 36/16
raised [1] 35/17
range [12] 6/1 6/4 6/4 6/13 7/18 7/18 10/16 17/3 45/2 46/13 48/11 54/13
Rapa [17] 4/14 11/8 11/11 11/14 11/18 11/24 14/19 15/2 15/9 32/25 34/21 34/24 43/21 48/2 52/3 52/13 52/21
Rapa's [1] 53/21
rare [3] 20/21 20/23 48/13
rate [1] 55/14
rational [2] 49/11 49/17
reach [1] 39/21
reaching [1] 16/24
reacting [1] 22/25
ready [1] 38/23
realize [2] 30/22 46/25
realizing [1] 19/6
recent [1] 12/20
recidivate [1] 26/4
recidivism [2] 26/2 30/19

# R

recognizes [1] 33/12
recommend [3] 3/20 7/1 28/13
recommendation [5] 3/17 3/23 41/11 43/4 57/16
recommendations [7] 27/15 27/17 39/12 52/11 57/5 57/11 58/16
recommended [2] 6/3 6/5
recommending [7] 7/4 10/4 10/6 10/8 14/8 25/16 46/12
record [10] 2/18 3/6 5/7 5/8 5/24 11/17 12/8 15/2 41/4 58/10
recorded [1] 32/1
recording [1] 32/2
records [24] 4/12 4/13 4/14 5/3 5/6 15/16 15/18 15/19 15/21 15/24 15/25 16/2 16/14 16/17 16/18 16/24 17/10 17/22 20/8 20/9 20/13 20/20 21/21 31/16
recover [1] 46/22
reduction [2] 3/20 42/22
referenced [1] 5/3
references [1] 54/3
reflect [2] 7/22 42/3
reflects [1] 2/18
refresh [1] 30/1
refusal [3] 29/1 34/4 34/19
Regional [1] 15/25
reiterate [1] 54/25
relation [1] 3/3
relative [1] 54/11

release [10] 4/20 6/3 52/14 55/13 56/2 56/3 56/5 56/7 56/9 56/24
released [1] 56/7
relied [1] 16/24
relying [1] 25/8
remain [2] 11/12 15/3
remorse [5] 30/9 30/15 30/16 30/18 30/20
repeated [1] 32/17
report [8] 14/11 14/15 14/20 15/2 16/9 54/16 55/19 56/6
Reporter [2] 1/24 59/12
reports [1] 19/20
request [6] 3/10 3/11 57/5 57/12 58/11 58/19
required [1] 53/6
requirement [2] 56/17 56/18
research [2] 26/2 31/3
residency [1] 12/17
resign [1] 13/18
responsibility [3] 30/20 49/7 50/17
restitution [8] 6/5 55/4 55/14 55/19 55/24 55/24 56/19 56/25
restriction [1] 56/16
result [2] 9/1 54/13
retardation [1] 20/24
review [1] 15/15
ride [1] 44/19
ringleader [1] 44/4
risk [7] 25/11 25/18 25/20 25/24 30/19 41/8 41/8
risks [1] 18/10
risky [1] 19/6

RMR [2] 1/23 59/12
road [1] 46/7
rob [1] 30/3
robbed [1] 45/5
robbery [1] 43/14
rod [2] 22/11 48/22
Rodriguez [1] 50/14
role [5] 8/2 14/6 44/2 45/12 51/19
roles [1] 51/12
room [1] 24/20
routine [1] 41/1
rule [1] 39/14
rules [1] 26/24

# S

satisfied [1] 42/15
satisfy [1] 55/23
scale [1] 17/9
scared [2] 38/13 38/14
schedule [2] 4/11 55/16
school [10] 15/23 16/15 17/10 17/12 17/21 20/13 21/17 31/18 31/20 48/7
schools [3] 21/11 21/12 21/13
scientific [1] 26/3
score [1] 18/18
seal [4] 14/15 14/15 15/4 40/19
sealed [3] 3/7 15/2 15/3
search [1] 56/18
seat [1] 11/15
Section [6] 3/1 3/4 3/5 6/22 7/21 54/18
sections [1] 5/9
security [9] 4/13 16/2 20/4 20/8 20/9 20/10 20/12 20/22 48/12
Segal [2] 29/9 52/16
sentence [20] 6/2 6/23 7/11 7/11

11/6 39/4 42/19 42/20 45/2 46/12 53/14 54/14 54/23 56/23 57/1 57/3 57/7 58/3 58/5 58/6
separation [1] 58/9
serious [1] 51/21
seriousness [1] 45/4
served [4] 13/3 26/11 54/25 56/5
services [5] 4/22 27/22 32/12 52/11 52/19
setting [1] 34/6
settings [2] 17/12 31/9
seven [2] 6/23 16/16
severe [2] 22/11 22/12
severity [1] 46/10
sexual [1] 14/5
shaking [1] 24/19
shall [10] 55/3 55/6 55/13 55/18 56/2 56/6 56/8 56/14 56/20 58/6
shame [1] 30/24
shared [1] 39/19
sheets [1] 41/2
Sheila [4] 4/14 11/8 11/14 11/18
Shiflet [5] 10/23 11/1 44/16 45/11 45/18
shocking [1] 35/22
shoot [4] 44/17 48/20 49/3 50/23
shooting [2] 21/25 22/10
Shores [1] 12/18
shot [2] 48/17 49/4
showered [1] 50/21
siblings [5] 27/6 37/15 37/19 37/20 37/20
side [2] 25/4

43/11
sign [1] 22/13
signs [1] 22/15
simplistic [1] 19/3
single [1] 36/25
sister [7] 35/7 36/3 36/12 36/22 38/14 49/2 52/8
sister's [1] 21/22
sisters [1] 30/13
situation [7] 9/9 9/10 9/11 19/6 29/7 31/8 34/8
situations [2] 18/9 19/5
skills [15] 18/8 29/1 29/1 29/2 29/7 29/13 32/14 34/3 34/4 34/11 34/18 34/19 40/12 40/14 52/20
smart [1] 38/4
smoking [1] 25/4
social [21] 4/13 16/2 18/9 19/5 19/5 20/4 20/8 20/9 20/10 20/12 20/22 29/2 29/7 29/7 29/13 32/14 34/3 34/11 34/18 48/12 52/21
society [2] 44/1 46/1
solely [3] 7/15 7/21 41/13
somebody's [1] 18/17
someone's [3] 17/18 22/23 25/24
sound [1] 18/7
South [2] 1/15 59/13
SOUTHERN [3] 1/1 39/11 58/17
special [10] 6/7 17/11 17/11 21/11 21/12 21/13 56/15 56/19 56/21 56/25
speciality [1] 28/6
specific [5] 27/23 28/11 28/12 40/22 45/24

# S

**spell** [1]  11/16
**spend** [1]  35/17
**spent** [2]  33/7
33/25
**spin** [1]  45/15
**spine** [1]  22/11
**spiraled** [1]  27/14
**Spivey** [34]  6/6
8/7 8/17 8/18 8/20
8/23 9/3 9/7 23/6
23/8 23/13 27/14
30/2 30/4 30/6
31/15 34/13 34/14
42/7 43/3 44/4
44/6 44/14 44/15
45/5 45/16 49/1
50/21 50/23 51/2
51/9 51/15 54/4
55/4
**spoke** [4]  4/10
22/2 22/2 27/5
**St** [3]  9/9 9/15
9/25
**stable** [1]  17/19
**staff** [1]  52/17
**stand** [2]  11/11
34/9
**standard** [1]  56/8
**standing** [2]
11/12 54/4
**starting** [3]  2/5
16/15 37/16
**state** [12]  2/4
5/23 11/16 12/22
13/11 13/14 14/1
14/3 14/6 14/7
25/16 58/6
**stated** [1]  25/1
**statement** [6]
35/15 39/25 40/1
46/16 50/7 50/9
**statements** [2]
10/21 54/15
**STATES** [28]  1/1
1/3 1/11 2/3 2/7
3/1 3/4 3/5 3/16
6/20 6/21 6/22 7/3
7/3 7/6 7/9 7/23
8/5 8/14 8/17 9/6
9/19 10/7 46/8
46/12 54/18 56/21

59/13
**static** [1]  25/18
**statistically** [1]
52/1
**statutory** [1]
54/17
**stay** [3]  21/21
34/3 50/22
**steal** [1]  45/6
**step** [1]  29/20
**Steven** [1]  15/25
**stole** [3]  45/6
45/6 45/7
**stood** [2]  30/4
44/17
**stopped** [2]  25/2
25/3
**stories** [1]  43/2
**story** [1]  43/3
**strange** [1]  27/20
**Street** [1]  1/19
**stress** [4]  16/12
22/14 23/20 27/20
**strict** [1]  35/19
**strong** [6]  8/8
27/5 45/14 45/20
45/23 47/9
**struggle** [1]  28/19
**struggles** [1]  29/3
**stuck** [3]  16/20
20/20 20/21
**Student** [1]  15/23
**stunned** [1]  36/21
**submit** [2]  41/9
51/1
**submits** [1]  46/8
**submitted** [1]  3/8
**substance** [4]
25/6 25/7 56/12
56/17
**substantial** [12]
3/11 7/8 7/10 7/22
7/24 8/14 10/7
41/17 42/3 42/21
45/12 53/17
**substantially** [1]
42/5
**succeed** [3]
26/20 46/1 48/14
**success** [1]  52/2
**successful** [2]
29/21 47/14
**successfully** [1]

21/10
**suddenly** [1]  48/7
**sufficient** [1]  7/8
**Suite** [1]  1/15
**suits** [1]  58/14
**summarize** [1]
12/11
**summary** [2]  4/12
15/23
**supervised** [7]
4/20 6/3 52/14
56/3 56/7 56/9
56/24
**supervision** [1]
27/7
**supplemented** [1]
5/15
**supplements** [1]
5/7
**support** [2]  47/11
52/4
**supportive** [2]
38/21 38/24
**supports** [1]  59/3
**surprising** [1]
48/10
**survival** [1]  40/17
**survived** [1]
48/21
**susceptible** [3]
19/11 31/7 33/22
**sustain** [1]  20/14
**sword** [1]  40/13
**sworn** [2]  11/12
11/14
**symptom** [1]
22/13
**symptoms** [1]
22/15
**system** [1]  43/15

# T

**tailored** [1]  28/11
**tale** [1]  43/2
**target** [1]  40/18
**targeted** [2]  31/15
40/6
**tasks** [1]  28/22
**taught** [1]  37/2
**teach** [4]  29/13
34/3 34/4 34/4
**teacher** [5]  31/20
31/23 32/2 32/3

32/4
**teachers** [3]
20/14 21/14 32/6
**teaching** [1]
34/17
**teared** [1]  30/10
**tease** [1]  16/19
**teenager** [1]
48/19
**ten percent** [1]
55/14
**ten-year-old** [3]
18/20 18/22 19/2
**term** [2]  56/3 56/4
**terms** [6]  17/25
18/8 18/20 27/7
34/1 51/17
**terrible** [2]  30/10
45/17
**test** [2]  18/17
25/6
**tested** [1]  17/10
**testimony** [8]  8/1
13/21 33/5 41/16
42/6 42/11 43/1
53/21
**thank** [27]  4/1
5/13 10/19 11/21
15/7 32/21 34/21
34/21 34/23 34/24
35/1 35/2 35/24
36/4 36/5 38/16
39/6 41/20 42/1
46/14 47/15 47/16
47/21 53/4 53/9
58/22 59/5
**therapy** [4]  27/22
28/8 28/9 57/22
**thinking** [6]  18/6
18/10 19/3 19/3
32/16 34/4
**Thomas** [1]  15/22
**thousands** [1]
16/1
**threat** [8]  9/3 9/15
9/16 39/17 39/21
39/23 40/10 40/23
**threatened** [6]
8/21 9/1 31/5
39/16 44/17 51/5
**threatening** [2]
23/6 41/3
**threatens** [1]

51/23
**threats** [4]  40/2
40/24 41/5 41/17
**threw** [1]  21/22
**time** [18]  10/5
11/2 13/17 14/22
16/15 16/15 20/12
21/22 22/12 23/25
24/18 25/1 25/14
33/24 34/22 43/7
44/15 55/15
**timeline** [1]  50/18
**times** [7]  17/10
19/18 22/10 31/9
40/8 44/12 48/18
**Title** [4]  3/1 3/3
3/4 54/17
**today's** [3]  3/7
3/15 4/4
**total** [8]  5/24 7/17
7/18 10/15 54/13
54/23 56/22 56/23
**totally** [1]  12/18
**toward** [2]  55/8
55/11
**town** [1]  49/14
**transcript** [2]
1/10 15/24
**transcription** [1]
59/9
**transfer** [1]  48/25
**trauma** [7]  22/22
22/25 48/23 48/25
53/2 54/6 57/22
**traumatic** [3]
22/13 23/20 27/20
**traumatized** [1]
23/2
**treating** [3]  26/8
26/9 26/15
**treatment** [21]
4/19 13/1 13/5
13/8 15/12 27/15
27/18 27/19 27/24
27/25 28/4 28/5
28/10 28/11 28/13
29/19 43/21 43/22
45/25 56/17 56/17
**trembling** [1]
24/20
**trial** [5]  8/12 8/19
39/20 39/22 49/8
**trouble** [3]  21/21

## T

**trouble... [2]**
27/13 52/5
**truth [2]** 9/21 9/24
**truthful [3]** 9/13
10/10 39/25
**truthfulness [1]**
42/14
**turning [1]** 42/2
**tweak [2]** 25/8
25/8

## U

**U.S [7]** 1/14 1/18
2/15 55/17 55/17
55/18 59/13
**ultimately [5]**
8/20 9/24 10/12
42/12 45/8
**unable [2]** 4/11
57/8
**unclear [1]** 50/19
**underlying [1]**
58/2
**understanding [1]**
19/5
**unexpected [1]**
55/22
**unfortunate [1]**
9/9
**unfortunately [1]**
25/4
**UNICOR [1]** 55/10
**unique [1]** 39/13
**unit [2]** 12/17
27/5
**UNITED [28]** 1/1
1/3 1/11 2/3 2/7
3/1 3/4 3/5 3/16
6/19 6/21 6/21 7/3
7/3 7/6 7/9 7/23
8/5 8/14 8/17 9/6
9/19 10/7 46/8
46/11 54/18 56/21
59/13
**University [3]**
12/13 12/14 12/15
**unlawfully [2]**
56/11 56/12
**unless [1]** 20/23
**unlikely [1]** 52/12
**unofficial [1]**
39/14

**unpaid [1]** 56/19
**unresolved [2]**
4/7 4/9
**unusual [1]** 21/24
**unwarranted [1]**
39/14
**update [1]** 5/9
**upset [1]** 48/19
**upside [1]** 46/20
**upside-down [1]**
46/20
**us [18]** 1/15 16/23
26/7 35/22 36/16
36/24 36/25 37/2
38/4 38/4 38/5
38/5 38/6 38/9
39/10 42/20 49/10
49/21

## V

**valid [1]** 53/2
**variance [5]** 3/10
42/24 45/1 47/20
47/23
**vary [4]** 53/3
53/19 53/22 54/12
**vehicle [2]** 50/3
54/5
**verbal [1]** 18/18
**versus [1]** 58/7
**via [1]** 15/5
**victim [8]** 10/21
22/1 27/21 29/23
45/18 46/15 50/2
54/6
**video [3]** 8/8 48/6
48/20
**violation [2]** 2/25
3/3
**violence [2]** 3/3
46/2
**violent [1]** 9/16
**vis [2]** 44/3 44/3
**visitation [1]**
58/20
**vitae [2]** 11/25
12/1
**Vreeland [4]** 2/15
2/16 5/4 5/13
**vs [1]** 1/5
**vulnerability [1]**
31/3
**vulnerable [1]**

31/11

## W

**wages [2]** 55/7
55/8
**walked [1]** 49/14
**warranted [1]**
45/3
**watched [2]**
36/19 36/19
**wear [1]** 37/24
**wearing [1]** 54/3
**weird [1]** 23/10
**welding [1]** 57/19
**whatsoever [1]**
27/2
**Whenever [1]**
3/18
**wholly [2]** 21/7
48/16
**Williams [1]**
15/25
**willingness [1]**
8/13
**wise [1]** 7/16
**wish [7]** 10/21
11/5 35/15 38/3
39/8 53/5 59/4
**wishes [1]** 46/15
**withhold [1]** 50/6
**witnesses [1]**
38/19
**woman [1]** 45/5
**wonder [1]** 39/24
**workplace [2]**
28/18 28/19
**workplaces [1]**
28/20
**worthless [1]**
31/25

## Y

**young [9]** 13/4
20/22 20/23 24/1
26/7 43/9 43/17
48/1 53/1
**younger [1]** 17/16

## Z

**ZAMOT [68]**
**Zamot's [11]** 4/12
7/17 17/8 21/2
38/21 40/23 42/3

42/10 45/2 45/24
48/10